[S. F. No. 9883. In Bank.—October 26, 1922.]

In the Matter of the Estate of JAMES R. RUSSELL, Deceased. LILLIAN RUSSELL, Respondent, v. ELLA F. RUSSELL et al., Appellants.

[1] ESTATES OF DECEASED PERSONS—WILL CONTEST—EVIDENCE—CONSIDERATION BY JURY.—In a will contest, the jury is warranted in believing as true all of the evidence in support of contestant's claims (unless it is inherently so improbable as to be entirely unworthy of belief) and in disregarding as untrue all of the evidence in behalf of proponents which is any way contradicted, or otherwise impeached.

[2] ID.—APPEAL—REVIEW OF FACTS—DUTY OF COURT.—It is the duty of the appellate court in reviewing the facts in a will contest to interpret the evidence so as to support the verdict, to the extent that it is reasonably susceptible thereto, in the light of the rule as to the right of the jury in believing and disbelieving evidence.

[3] ID.—EVIDENCE—LETTERS—HEARSAY.—In a will contest, statements contained in letters which had been written by a son and by a sister-in-law of the testator were pure hearsay and incompetent to

---

3. Admissibility of declarations of beneficiary or executor to show lack of testamentary capacity or undue influence, notes, 9 Ann. Cas. 807; Ann. Cas. 1918A, 1066; 38 L. R. A. (N. S.) 731.

prove any fact at issue therein and admissible only for the purpose of impeaching the writers as witnesses.

[4] ID.—TESTIMONY AS TO STATEMENTS—REMOVAL OF HEARSAY CHARACTER.—In a will contest, hearsay statements contained in letters written by the testator's son and sister-in-law were rendered competent where the writers declared the statements were true in their testimony and the letters were then offered and received in evidence without objection.

[5] ID.—IMPROPER METHOD OF EXAMINATION OF WITNESS—ABSENCE OF OBJECTION—LACK OF PREJUDICE.—In a will contest, error cannot be claimed on account of the practice indulged in by counsel for contestant in examination of a witness, of reading to him in the presence of the jury all or a portion of a letter written by him and then questioning him in regard to the statements therein contained, which statements were incompetent for any other purpose than impeachment, where such method of examination was pursued without objection and with at least the tacit acquiescence of counsel for proponents.

[6] ID.—MENTAL SANITY—OPINION OF LAY WITNESS—WEIGHT.—The opinion of a lay witness upon a question of mental sanity is of no value other than such as is afforded to it by the facts stated and the reasons furnished by the witness in support thereof.

[7] ID.—BIAS OF WITNESS—APPEAL.—The apparent bias and unfairness of witnesses is a matter which goes only to the weight and credibility of their testimony and cannot be considered on appeal, so long as their testimony is not inherently incredible.

[8] ID.—INVALIDATION OF WILL—EXTENT OF MENTAL DERANGEMENT.— Mere proof of mental derangement or of insanity, in a medical sense, is not sufficient to invalidate a will, but the contestant is required to go further and prove either such a complete mental degeneration as denotes utter incapacity to know and understand those things which the law prescribes as essential to the making of a valid will, or, the existence of a specific insane delusion which affected the making of the will in question.

[9] ID.—GENERAL TESTAMENTARY CAPACITY—EVIDENCE.—In this proceeding to revoke the probate of a will, there is nothing in the record which is irreconcilable with the conclusions that the testator at the time of making the will understood the nature of the business in which he was engaged, that he had a recollection of the property he meant to dispose of, and of the persons to whom he desired to bequeath it and of the manner in which he desired to distribute it.

8. What constitutes capacity or incapacity to make a will, notes, 27 L. R. A. (N. S.) 2; L. R. A. 1915A, 444.

[10] ID.—INSANE DELUSION—EVIDENCE—IMPROPER CONDUCT OF MOTHER OF CONTESTANT—COMPETENCY OF STATEMENTS OF TESTATOR.—In a proceeding by a daughter of a testator to revoke the probate of a will on the ground that he possessed an insane delusion that she was not his daughter, evidence that the testator, in his later years, told several persons that when she was about three and a half years old he found a man in bed with her mother was competent for the purpose of proving that he then believed such to be the fact, but was pure hearsay and wholly valueless for the · purpose of proving that such an incident had in fact occurred.

[11] ID.—PATERNITY OF CONTESTANT—BELIEF OF TESTATOR—MENTAL DERANGEMENT.—Where a testator for a period of more than forty years entertained no suspicion of belief that the contestant of his will was not his daughter, such belief first appearing without a showing of any fact, circumstance or evidence transpiring, can only be ascribed to the spontaneous generation of a diseased mind.

[12] ID.—LACK OF BASIS FOR BELIEF—BURDEN OF PROOF.—A daughter contesting a will on the ground that the testator possessed an insane delusion that she was not his daughter which first appeared forty-two years after her birth, has the burden of proving that the testator did not at some later time receive some evidence or information sufficient in law to provide a basis in reason for his belief.

[13] ID.—INSANE DELUSION—EVIDENCE—PRIMA FACIE CASE.—Where in such a contest, the contestant, starting with the admitted fact of her paternity, proved by evidence sufficient to go to the jury that for forty-two years the testator never questioned the fact but that, on the contrary, his attitude during this period was uniformly, so far as disclosed, that of an affectionate father, and called to the stand apparently all the available witnesses who would be likely to know of the existence of any fact or circumstance or evidence which would afford a reason for this belief, and elicited from all of them that they knew of no such fact or circumstance of evidence, she made a sufficient *prima facie* case to shift the burden of evidence to the proponents and to make it incumbent upon them to show the existence of some such evidence or information.

[14] ID.—HYPOTHETICAL QUESTION—PROVINCE OF JURY NOT INVADED. A hypothetical question asked an expert alienist in a will contest as to whether if the assumed facts were true, the testator was able to understand and carry in his mind the nature and situation of his property and his relations to his relatives and those around him with clear remembrance as to those in whom and those

11. Insane delusion with respect to relative as affecting testamentary capacity, notes, Ann. Cas. 1916C, 4, 29, 33, 35; Ann. Cas. 1918D, 471.

things in which he had been mostly interested and capable of understanding the act he was doing and the relation in which he stood to the objects of his bounty, free from any delusion, was not objectionable as invading the province of the jury by calling upon the witness to determine the ultimate question in issue.

[15] ID.—PLEADING—AMENDMENT OF CONTEST—EXISTENCE OF INSANE DELUSION—STATUTE OF LIMITATIONS.—An amendment to a will contest more than a year after the probate of the will specially pleading the existence of an insane delusion is not the statement of a new and distinct cause of action so as to be barred by the statute, where the contest was filed within the year and contained a general allegation of incompetency.

[16] ID. — MENTAL COMPETENCY — REMEMBRANCE OF CHARACTER AND "EXTENT" OF PROPERTY—INSTRUCTION.—An instruction wherein the jury was told, in the definition of general mental incompetency, that the testator must be able to remember the character and extent of his property was not prejudicial, where the entire estate consisted of money.

[17] ID.—INSANE DELUSION—INSTRUCTION.—An instruction in effect that if the jury found that the testator was suffering from an insane delusion as defined in the instructions and that the will was the product thereof, they were to find against the will notwithstanding they might also find that he had sufficient capacity to attend to his ordinary business, was not erroneous.

APPEAL from an order of the Superior Court of Alameda County revoking the probate of a will. E. C. Robinson, Judge. Affirmed.

The facts are stated in the opinion of the court.

tum Suden & tum Suden for Appellants.

A. J. Woolsey and Harry G. McKannay for Respondent.

MYERS, J., _pro tem._—This is an appeal from an order revoking the probate of a will on a contest instituted after probate. The grounds of contest were insufficient execution, undue influence and mental incompetency. A nonsuit was granted as to the first two grounds, and the issue submitted to the jury on the third, resulting in a verdict for the contestant. Proponents appeal on the grounds of insufficiency of the evidence and errors of law. Contestant is a daughter of the testator, and the will under contest bequeathed the entire estate to Ella F. Russell, the second

wife, and named her and Elbridge Russell, a son by the second marriage, as executors thereof. The unsoundness of mind is alleged to consist in both general mental incompetency and a specific insane delusion that the contestant was not the daughter of the testator.

[1] In considering the question of the sufficiency of the evidence to support the verdict, it is well to bear in mind that the jury was warranted in believing as true all of the evidence in support of contestant's claims (unless it was inherently so improbable as to be entirely unworthy of belief) and in disregarding as untrue all of the evidence in behalf of proponents which was in any way contradicted, or otherwise impeached. [2] It is likewise the duty of the appellate court in reviewing the facts to interpret the evidence so as to support the verdict, to the extent that it is reasonably susceptible thereto, in the light of the foregoing rule. Applying this rule of interpretation to the evidence herein, the facts appear therefrom substantially as follows:

The will was executed July 9, 1919, by the testator, who was then confined to his bed in his last illness and who died therefrom four days later. The cause of death was "general spinal paralysis," and the disease had first manifested itself in the form of an apoplectic stroke suffered by the testator September 16, 1916, resulting immediately in paralysis of the left portion of his body and limbs, from which he had never fully recovered.

The testator was born in Massachusetts in 1851, was married there in 1873, and his daughter, Lillian, the contestant, was born three or four months thereafter. Contestant testifies that her father said to her in 1908, "I wronged your mother and had to marry her, I want now to ask your forgiveness." Of course, this is not competent evidence to prove such fact, but it is competent to prove that the testator then believed such to be the fact. On the other hand, counsel for proponents testified that some time after October, 1916, testator had told him that "when he was a young fellow he was made the goat." Testator lived with his wife and child nearly four years, then suddenly abandoned them and never thereafter communicated with them during the life of the wife. As to the existence of any fact affording a reason for this action, the record is entirely void of any competent evidence. It is in evi-

dence that testator told the contestant, in 1908, that he came home one day and found his wife in company with a woman with whom he had forbidden her to associate, and that he thereupon left; that he had been a skunk all his life, and that he was sorry to have to make the confession. On the other hand, witnesses for proponents testified that he had told them that he came home one day and found a man in bed with his wife, and that was the reason he left. It does not appear, however, that he ever told this story to anyone prior to 1915, thirty-nine years after the supposed occurrence. The proponent, Ella F. Russell, testified that he told her the story at the time of their marriage in 1892, and that, referring to his first wife, "he cursed the very ground she walked on." But it must be remembered that the jurors had a right, if they saw fit, to disbelieve the testimony of this witness, because of her interest as the sole beneficiary under the will, and because they might conclude that she had been successfully impeached by the evidence of conflicting declarations made by her at other times.

The testator's first wife died in March, 1888, and almost immediately thereafter he instituted inquiries to locate his daughter, which resulted in a correspondence between them lasting until the latter part of 1889. Four letters written by the testator during this period are in evidence, and it is not clear whether or not there were any more. In these letters he repeatedly refers to contestant as "my child" and "my dear child," always refers to himself as "your father," and the letters contain numerous expressions, apparently sincere, indicating love, affection and parental solicitude for the daughter's welfare. In his last letter of this period, dated October 7, 1889, he incloses $10, promises to write her a long letter soon and urges her to write soon and send him her picture. Then he appears to have dropped from sight again, so far as the daughter was concerned. He had removed from Santa Ana, and contestant sent letters to him addressed to Santa Ana, to Oakland, to Alameda and San Francisco, which were returned to her by the postoffice as "unclaimed." Contestant heard nothing from him thereafter, until 1907, when she learned of his business address in San Francisco, wrote him there, and then followed an affectionate correspondence between them, which con-

tinued with more or less regularity up to January, 1917. Some dozens of letters written by the testator during this period are in evidence, and contestant testified that there were many more which she had not brought with her to California because she had not realized that they would be material. It appears that the letters prior to 1913 were long and "chatty" and abounded in expressions of parental love, affection and solicitude; that those subsequent to that year were usually brief. Contestant explains this change by saying that testator said to her, in 1913, that her brother Elbridge, was now old enough to write her all the news, that he, her father, was very busy, and that she must not expect long letters from him thereafter, but must rely upon Elbridge to write her all the news.

The testator, in planning and building a new house in 1907, added thereto a room which was expressly planned to be the room of this daughter, the contestant. In 1908, upon invitation of the testator, seconded by the other members of the family, she came west on a visit, and remained six months as a member of the family. During this time she was introduced to the friends and neighbors by the testator as his daughter, and uniformly so treated by the testator, his wife and son. Thereafter she returned to her home in Massachusetts. In 1911, while on an eastern trip, the testator arranged for the daughter to meet him in Chicago, and they proceeded thence together upon a combined business and pleasure trip to this coast, by way of New Orleans and various southern cities. Finally arriving at testator's home, contestant again remained there as a member of his family three or four months. On the occasions of both these visits the testator urged the contestant to remain here permanently as a member of his household, which she declined. The testimony is without conflict that throughout both these visits the relations between the contestant on the one hand and the testator and the other members of his family on the other were uniformly cordial, affectionate and harmonious, with the single exception that the testator was disappointed and perhaps displeased at her refusal to remain permanently as a member of his household. In 1913 the testator visited contestant at her Massachusetts home, and throughout this visit their relations were equally affectionate and harmonious. On the occasion of this visit the testator repeated the

assurances which he had several times previously given to contestant—that he would always see to it that she should be provided for financially. He had made at least one other visit to her during this period.

When their correspondence had been resumed in 1907 he had made her an allowance of $10 per month, which was increased to $25 a month during her visit in 1908, and was paid regularly thereafter until some time in 1915, when it was cut down to $15, which he continued to pay until 1917. In January, 1917, he wrote her, "cannot send you more remittances for present as I have all the expense can stand here." At that time he was confined to his house from the paralytic stroke, and his salary, which was his sole income had been discontinued by his partner. Notwithstanding testator's action at this time, his wife continued to send contestant the monthly allowance out of her own funds.

Testator did not thereafter communicate directly with contestant (although she continued writing to him, and the son, Elbridge, continued writing to her), until December, 1917, when testator sent her the following letter:

"San Francisco, Dec. 1, 1917.

"Miss Russell as you call yourself.

"Enclosed find Ck. for $15.00 which is the last I will send to you reasons I am getting well along in years and have a family to support without assistance from anyone which is no joke in times like these. I don't doubt but you need money who don't but you cannot get it from me. would, suggest you hunt up some of your mothers gentlemen friends who accomodated then and encourage them to contribute to your birth—there never was a young man stung more than I so if you interview them they may held you Minnie and Jim Hagan know some if not I will tell you. I curse her every day of my life and her offspring I hate the sight off and it makes me puke to think off

"Please do not write me again I never want to hear from you I offered you a home once in Calif you would not accept but never again.

"J."

In November, 1914, testator had made a holographic will in which he left his entire estate to his wife, "knowing that she will do justice to all interested," and in which he did

not mention either of his children, except by naming his son as one of the executors thereof. In October, 1916, he made a will in which he provided for each of the children, the provision for contestant being an annuity of $35 per month for life, and the creation of a trust fund of $12,000 to carry out the purposes thereof. On July 7, 1919 (six days before his death), he republished and reaffirmed this last will by executing a codicil thereto whereby he changed the executors thereof but made no other change except such as was necessitated by the fact that he had in the meantime sold out his business. Two days later he executed the will here in contest, leaving his entire estate to his wife and expressly excluding his son, Elbridge, and his daughter, Lillian, from participation therein.

Counsel for the respondent claim that the evidence proves that the testator, in connection with his stroke suffered in 1916, underwent a mental degeneration evidenced by a complete change of personality. Their claims as to what the evidence proves in this behalf are well summarized in the following language in their brief:

"Here we find a man who, prior to his stroke, was a loving father, affectionate, regular in his habits, apparently in control of his emotions, and friendly and lovable in all relationships, both business and personal, suddenly transformed into an individual capable of writing the document hereinabove referred to the unfortunate child whom he deserted in her infancy, suddenly claiming that she is not his child; in his business relationship unexpectedly turning upon his partner of twenty years, quarreling with him daily, using the most profane and violent language, threatening to strike him with a cane, challenging him to fight a duel and in every other manner acting in a most unbecoming manner many times daily before the office employees at the tannery. Before his stroke, he was normal, vigorous, quick thinking, keen, active, pleasant and aggressive, in business, and after his stroke he could not walk with vigor, his speech was thick, his left foot dragged, his mouth drooled and his left hand and arm were practically useless. Where before his sickness he assumed full control and management of all of the affairs of the office of a large tanning concern, after his sickness he did nothing. He would go to the office and stare into space, tell the stenographer to answer the letters,

told her it worried him to answer them, he could not keep his mind on the subject, that he tired quickly. The general trend of his physical and mental condition was steadily down hill. He lost his temper very quickly, grew irritable and angry, would shout and stamp his cane on the floor. He became vulgar and profane, suspicious of his partner and of all his business associates, as well as his attorney.''

Without attempting to review in detail the mass of evidence on this subject, it will suffice to say that there was evidence which, if believed, was legally sufficient to support substantially all of the foregoing claims. There was also an abundance of evidence to the contrary thereof. This but presents the common situation of a conflict of evidence, which was to be resolved by the jury.

[3] Appellants contend that the major portion of the evidence relied upon to support contestant's claims in this behalf is incompetent for that purpose, being statements contained in letters which had been written by Elbridge Russell, and by Miss Arnold, a sister-in-law of the testator. The statements contained in those letters were, of course, pure hearsay as against the appellants; were incompetent to prove any fact at issue herein, and were admissible in evidence only for the purpose of impeaching those witnesses. [4] But those statements, for the most part, were rendered competent evidence herein by virtue of their adoption by those witnesses as part of their testimony at the trial. For example, the witness would be shown a statement in one of the letters and asked, in effect, if that statement was true, and the witness would reply, in effect, that the statement was and is true, and that the fact was and is as there stated. After a letter of the witness had been gone through in this fashion, and its statements adopted as the present testimony of the witness, it would then be offered and received in evidence, without objection from appellants. In this connection it may be noted that any admissions of fact contained in letters written by Ella F. Russell were competent evidence in behalf of the contestant because she was the sole beneficiary under the will. (*Estate of Ricks*, 160 Cal. 467, 485 [117 Pac. 539].)

[5] Appellants now complain of the practice indulged in by counsel for contestant in the examination of Elbridge Russell, of reading to him in the presence of the jury all

or a portion of a letter written by him and then questioning him in regard to the statements therein contained. Of course, those statements were incompetent for any purpose other than the impeachment of the witness, and it is urged that this procedure was improper, unfair and highly prejudicial. This method of examining a witness cannot meet with our approval, but the record shows that it was here indulged in without objection and with at least the tacit acquiescence of counsel for appellants. It further appears that all of the letters which had been so read in the presence of the jury were thereafter introduced in evidence without any objection whatever. For these reasons no error can be claimed in this connection.

[6] But two witnesses testified directly in behalf of the contestant that the testator was of unsound mind. Appellants contend that when the facts stated and the reasons given by these witnesses for their opinion are considered it becomes apparent that the opinion is of no value and is not entitled to be accorded any weight whatever. It is true that the opinion of a lay witness upon a question of mental sanity is of no value other than such as is afforded to it by the facts stated and the reasons furnished by the witness in support thereof. But we cannot say that the facts stated by these two witnesses do not afford a reasonable and sufficient basis for the conclusions expressed by them. The substance of their testimony is summarized in the foregoing quotation from respondent's brief. As was said in 3 Elliott on Evidence, 774: "If a mild, quiet, amiable and modest man should suddenly become irritable, harsh, suspicious, obscene and profane, evidence of such a revolution of temperament and character would be admissible as tending to show mental derangement." [7] Much is said in appellants' briefs as to the apparent bias and unfairness of these two witnesses. But that is a matter which goes only to the weight and credibility of their testimony, and cannot be considered here, so long as their testimony was not inherently incredible.

[8] But mere proof of mental derangement or of insanity, in a medical sense, is not sufficient to invalidate a will. The contestant is required to go further and prove either such a complete mental degeneration as denotes utter incapacity to know and understand those things which the law prescribes as essential to the making of a valid will, or,

the existence of a specific insane delusion which affected the making of the will in question. Counsel for respondent claim that she has submitted an abundance of proof upon both of these issues.

[9] Upon the question of general testamentary incapacity we are inclined to hold, after an examination of the entire record, that there is nothing therein which is irreconcilable with the following conclusions: That the testator at the time of making the will understood the nature of the business in which he was engaged; that he had a recollection of the property he meant to dispose of, and of the persons to whom he desired to bequeath it, and of the manner in which he desired to distribute it. This being so, it follows that the evidence was insufficient to overcome the presumption of sanity in these respects. There remains to consider under this issue only the question of the ability of the testator to know or understand his relation to his relatives, the natural objects of his bounty. This question, in the instant case, is substantially identical with that presented by the allegation of an insane delusion; the claimed delusion being the belief that the contestant was not the daughter of the testator.

[10] In considering the question of an insane delusion we start with the admitted fact that the contestant was the daughter of the testator. We come next to the proven fact that, so far as the evidence discloses, the testator never voiced a question or doubt or suspicion concerning her paternity until forty-two years had elapsed after her birth. Nothing is shown to have occurred at this time (1915), or at any time after contestant was born, which affords any ground, reasonable or unreasonable, for this belief. Counsel for appellants argue that the fact that when contestant was three and a half years old testator found a man in bed with her mother furnished an abundantly sufficient reason to take the belief out of the category of insane delusions. It may be doubted whether, if this were a fact, it alone would afford a basis in reason for a belief which was first formed more than forty years thereafter; but there is not a scintilla of competent evidence in this case that such an incident ever occurred.

Evidence that the testator, in his later years, told this story to several persons was competent for the purpose of

proving that he then believed such to be the fact, but it is pure hearsay and wholly valueless for the purpose of proving that such an incident had in fact occurred. This story as told by the testator may have been either a delusion or an insane delusion, or it may have been true, or it may have been a plain falsehood. The conclusion that it was a falsehood is rebutted by the presumption of honesty, which is but an application of the presumption "that a person is innocent of crime or wrong." The conclusion that it was true is rebutted by the presumption of chastity, which is but another application of the same basic presumption of innocence. This leaves open only the conclusion that it was either a delusion, that is to say, a fixed belief that a thing is true which is not true, or which is not true in the manner in which it is believed; or an insane delusion, that, is to say, such a belief entertained without any basis in reason or evidence and adhered to against reason and evidence. At any rate, there is no basis at all in the evidence for a conclusion that any such incident as related by the testator ever occurred.

[11] The evidence discloses only this single fact or circumstance to which this belief of the testator can in any way be ascribed: that the contestant was born three or four months after the marriage, and must, therefore, have been conceived out of wedlock. If the testator had entertained this belief, or even a suspicion concerning her paternity from the time of her birth, it might be fairly said that this circumstance affords that slight basis in reason for the belief, which is all that the law requires to take a delusion out of the category of insane delusions. But when it is shown that the testator entertained no such belief or suspicion for a period of more than forty years, such belief thereafter first appearing can be ascribed in reason only to some fact or circumstance or evidence which thereafter transpired. There being no such fact or circumstance or evidence disclosed, it remains only to ascribe the belief to the spontaneous generation of a diseased mind. This conclusion is rendered more probable by the proof of the many facts and circumstances above referred to, which, as Elliott says, may be regarded as *indicia* of mental derangement.

[12] Appellants argue that the burden of proof was upon the contestant to prove the insane delusion and that she has

failed to meet the requirement of the law, in that she has failed to prove that the testator did not at some later time receive some evidence or information sufficient in law to provide a basis in reason for his belief. **[13]** The rule of law is beyond question that the burden of so proving rested upon the contestant, but we are not prepared to agree that the effect thereof goes to the extent claimed for it by counsel. The contestant, starting with the admitted fact of her paternity, proved (by evidence sufficient to go to the jury) that for forty-two years the testator never questioned this fact but that, on the contrary, his attitude during this period was uniformly, so far as disclosed, that of an affectionate father. Then, after showing the formation of this belief in the testator's mind, and its apparent effect upon the will, contestant called to the stand apparently all the available witnesses who would be likely to know of the existence of any fact or circumstance or evidence which would afford a reason for this belief, and elicited from all of them that they knew of no such fact or circumstance or evidence. We are of the opinion that in so doing contestant sufficiently made a *prima facie* case. To hold, as appellants contend, that contestant is required to go further and to negative every possibility that testator might at some time in his life have received some information which afforded some basis for his belief, would be to require of her the performance of an obvious impossibility. We are satisfied that in making the proofs above mentioned contestant made a sufficient *prima facie* case to shift the burden (not the burden of proof, but the burden of evidence), to the proponents, and to make it incumbent upon them to show the existence of some such evidence or information.

**[14]** Contestant called as witness a physician who, after qualifying as an expert alienist, was asked a hypothetical question which assumed the facts claimed by contestant to have been proved. The question ended as follows: "assuming these facts to be true, was the subject of this question able to understand and carry in his mind the nature and situation of his property and his relations to his relatives and those around him, with clear remembrance as to those in whom and those things in which he had been mostly interested, capable of understanding the act he was doing and the relation in which he stood to the objects of his

bounty, free from any delusion, the effect of disease, which might lead him to dispose· of his property otherwise than he would if he knew and understood what he was doing, on July 9, 1919, the date of his will''? The question was objected to ''as confiding the determination of this entire issue to the expert, and invading the province of the jury,'' and ''as not based on the facts brought out in the testimony.''

Appellants specify in their briefs numerous assumed facts which are claimed to be without support in the evidence. Without reviewing them all in detail it may be said that the great majority of the assumptions so attacked do find some support, direct or inferential, in the evidence; that the few which do not and which should, therefore, have been excluded doubtless would have been excluded if they had been called to the attention of court and counsel at the trial. For example, the question assumed that ''the doctor informed the subject that he had a clot of blood on the right side of the brain which would have to dissolve before he would be able to recover.'' What ''the doctor informed the subject'' was, of course, hearsay, but the jury might have inferred the presence of a clot of blood on the right side of the brain from the proven fact that the patient's entire left side was paralyzed. ''What the subject told his stenographer about being disinclined to dictate letters,'' was competent evidence of his state of mind. The question assumed that ''the writing of this letter (hereinabove quoted) was a great shock to the members of his family.'' This, of course, was a false quantity and should have been excluded, but we cannot see that proponent was prejudiced by its inclusion.

It is worthy of note that to this question as first framed appellants objected only generally on the ground that it assumed facts not in evidence. It was only after repeated requests from the trial judge that counsel consented to specify the particulars thereof. When he did so the question was then reframed by contestant to meet every objection so specified. Again appellants contented themselves with the general objection, in the face of repeated requests that they specify the particulars, saying they ''would rather stand on the objection.'' It might well be urged in view of these circumstances that appellants are estopped to now

claim error in this behalf; but it is sufficient to say that we find no prejudicial error in any event.

There is no merit in the contention that the objection should have been sustained because the question invaded the province of the jury by calling upon the witness to determine the ultimate question in issue. This question when answered by the witness still left for the determination of the jury at least all of the following questions: (1) the credibility of the witness, (a) as to his skill and learning, (b) as to his honesty, impartiality and fairness; (2) as to whether or not each of the assumed facts had been proven; (3) as to whether or not the facts assumed had been fairly selected from among the facts proven; (4) as to whether or not material facts omitted from the question had been proven. The cases cited by appellants are not in point here. Some of them had to do with a question which called for a mixed conclusion of law and fact; the others, with a question which called for the opinion of the witness upon a question not "of science, art or trade," and which was not a proper subject of expert testimony.

[15] This contest, as originally filed within a year after probate, alleged generally that "the said deceased was not of sound and disposing mind, or of sound or disposing mind, and was not competent to make his last will" on the date in question. Thereafter, more than a year after the probate, contestant, by leave of court, filed an amendment thereto, specially pleading the existence of the alleged insane delusion. Appellants contend, on the authority of *Estate of Ruffino*, 116 Cal. 304, 317 [48 Pac. 127] that the issue of an insane delusion was not raised by the general allegation of testamentary incompetency; that it was presented only by the specific allegations contained in the amendment; that the amendment was filed too late and therefore the latter issue is barred. The Ruffino case does not so hold. What was there decided was that an allegation that the testator was deceived by false representations which were made to him, and a finding responsive thereto, constituted neither allegation nor finding of an *insane* delusion. The allegations and findings there involved were relevant to an issue of fraud, rather than insanity. Assuming that it is necessary to specifically allege the existence of an insane delusion in order to tender that issue (which we do not hold), still

the gist of the cause of action thus pleaded would be the same as that pleaded by the general allegations, to wit: testamentary incapacity. Even under that view of the law the amendment could not be held to state a new and distinct cause of action, so as to be barred by the statute.

Neither is there any merit in the claim that the issue of general incompetency was abandoned at the trial. The court fully instructed the jury upon both issues, at the request of both parties.

Numerous other rulings of the trial court in the admission of evidence are specified as error. We find that some of them were erroneous, but we are unable to conclude that the appellants could have suffered any substantial prejudice therefrom.

[16] Many attacks are made upon the instructions given, predicated for the most part upon a very close and critical, not to say hair-splitting analysis of the words used therein. Perhaps the most substantial error thus pointed out is that wherein the jury was told, in the definition of general mental competency, that the testator must be able to remember the character *and extent* of his property. Conceding that in the case of a testator whose estate was very large and diversified this instruction might be prejudicial, it is clear that it could not have so operated here, where the testator's entire estate consisted of the sum of $135,000, which was the net purchase price received by him from the sale of his business the preceding month.

[17] The court did not err in instructing the jury, in effect, that if they found that the testator was suffering from an insane delusion as defined in the instructions and that the will was the product thereof, they were to find against the will notwithstanding they might also find that he had sufficient capacity to attend to his ordinary business. Neither was it error to give the similar instruction predicated upon their finding a lack of general testamentary capacity.

All of the essential matters contained in proponents' instruction IX, which was refused, were embodied and correctly stated in other instructions which were given by the court. The two instructions given by the court of its own motion are not fairly susceptible to the construction claimed for them by appellants. Fairly construed and read together the instructions given present a full, impartial and

substantially correct exposition of the rules of law applicable to the questions of fact submitted to the jury.

It has frequently been remarked that juries are often prone to set aside a will because the provisions thereof do not happen to accord with the juror's concepts of justice and fairness. It may also be said to be the duty of the reviewing court to scrutinize with great care the evidence upon which a verdict invalidating a will has been predicated, where the sufficiency thereof is questioned. But that is the most that can be properly claimed in this behalf. The sufficiency of the evidence in such a case is to be measured by the same standard and tested by the same rules which are applicable to all other cases. So measured and tested, we conclude that the evidence herein was legally sufficient to sustain the verdict, and that no prejudicial error was committed at the trial.

The judgment is affirmed.

Shaw, C. J., Lennon, J., Waste, J., and Richards, J., *pro tem.*, concurred.

LAWLOR, J., Dissenting.—I dissent. I adhere to the view expressed in the first opinion rendered in this case (64 Cal. Dec. 37), that the evidence was insufficient to show a want of testamentary capacity, and it will not be necessary again to review it.

It is conceded by the majority opinion that the evidence of decedent's having told the story of the circumstances under which he left his first wife was competent to prove his state of mind. The issue raised by the pleadings was whether he was seized with an insane delusion after the stroke in September, 1916, notwithstanding the evidence that he had such a state of mind from the time he left her in 1876 until his death. In any event, the issue of the sufficiency of the evidence was so closely contested it cannot be said the verdict was unaffected by any errors that may have been committed.

The main opinion concedes the hypothetical question contained inadmissible hearsay statements. This error and the inclusion of the erroneous element that decedent became enraged at his partner "apparently without any cause or provocation," in my opinion rendered the question lacking in

a fair and substantial statement of the evidence. The admission of the opinion of the expert witness, the only one called, was calculated to influence the verdict, and should have been excluded. Further, the course followed by respondent's counsel in getting before the jury the contents of letters written by relatives of the decedent giving accounts of his physical and mental condition was clearly improper and such a practice is condemned in *Estate of Packer*, 164 Cal. 525 [129 Pac. 778]. A large part of the evidence in support of respondent's case was contained in such letters, and their admission under the circumstances could not have failed to be prejudicial. I do not think from the record it can be said that counsel for appellants did not object to the reading of such letters to the jury. They did not object every time such evidence was offered, but that was not necessary, since it appears that the whole course pursued was objected to. "Where a party has once formally taken exception to a certain line or character of evidence, he is not required to renew the objection at each recurrence thereafter of the objectionable matter arising at each examination of other witnesses; and his silence will not debar him from having the exception reviewed." (*Green* v. *Southern Pacific Co.*, 122 Cal. 563, 565 [55 Pac. 577].)