## WHITTINGTON, Rec., v. McMASTERS et al.

No. 29147. Oct. 8, 1940.

Rehearing Denied Jan. 7, 1941.

*109 P. 2d 228.*

A. K. Little and Byrne Bowman, both of Oklahoma City, for plaintiff in error.

Bond & Bond, of Duncan, for defendants in error.

WELCH, V. C. J. This action was commenced in 1938 to cancel a mortgage and foreclosure proceedings and to recover the real estate, and is based upon the theory that the mortgage executed thereon in 1922 was void for the reason that same was at the time the homestead of the owner, and at the time of the execution of the mortgage the wife of the owner was incompetent and incapable of understanding the nature of her act when she joined her husband in the execution thereof. The action is prosecuted by or on behalf of Mollie P. McMasters, surviving widow, and several surviving children of Walter W. McMasters, deceased, former owner of the land involved.

Shortly after the execution of the mortgage the owner died, and the same was foreclosed in 1928, and the defendant here purchased the same at sale upon foreclosure.

Plaintiffs prevailed in the trial court, and defendant has appealed.

Defendant urges here that plaintiffs are pursuing an equitable remedy, citing Warner v. Coleman, 107 Okla. 292, 231 P. 1053, and Moors v. Sanford (Kan.) 41 P. 1064, and that the findings of fact of the court and jury are not supported by the evidence, and are against the clear weight thereof.

We have examined the record with respect to the question thus presented

and agree with defendant's position as to the finding by the court that the wife was without understanding of the nature of her act at the time she joined in the execution of the mortgage.

Since 1908 to the time this suit was brought, the wife has suffered a number of attacks of a mental disorder described as manic depressive psychosis. Between such dates she was committed to the Central Oklahoma State Hospital for the insane at Norman several times. She would remain in the hospital for varying periods of time of a few months to several years, and would be discharged and return to her home and family for approximately equal periods.

At the time the mortgage was executed, on November 22, 1922, she had been out of the hospital since October 2, 1916. She was returned to the hospital on December 2, 1922.

Several of plaintiffs' witnesses were her children, most of whom were quite young when the mortgage was executed. One of the eldest of these, who was 17 years of age at the time the mortgage was executed and who was present when the same was signed, testified that his mother refused to sign for several days, and resisted his father's efforts to persuade her to sign the same for several days before she did sign it; and that she cried about signing; that from the date the mortgage was signed to the time she was returned to the hospital she was in a very bad condition; would get mad at the smaller children; would get up in the middle of the night and start washing, and tried to get the other folks up at any time of the night to go to work; and at times would have to call in the neighbors to help protect the smaller children from her. He also testified that his mother was sick at the time the mortgage was signed, and that although she signed some of the papers, she refused to sign all of them, and that he signed her name on some of the papers at his father's direction. The trial court found, however, that the wife signed the mortgage. No other of the witnesses for plaintiffs were present at

the time the mortgage was signed, but others of the children testified that plaintiff's general mental condition was bad about the time it was signed; she would act very rude and try to hurt the children; that the father begged the mother to sign a mortgage and that she did not want to do so. The testimony of plaintiffs' witnesses generally was to the effect that at times the mother acted as a normal person and at other times she fought the children and would rave.

Other witnesses testified that occasionally they would be called in to help control her and keep her from hurting the children.

The witness who represented the loan company when the mortgage was signed testified he was present and that he did not observe any unusual conduct on the part of the wife when the mortgage was signed; that she conducted herself in all respects as would a normal person.

The evidence, largely on the part of plaintiffs, shows that the mother was again at home in 1925-26-27, and that during such time she transacted the business of operating the farm, borrowing money at the bank, etc. (her husband being then deceased), and that on at least two occasions she personally wrote the loan company seeking leniency in the matter of payments due on the land loan, and that she talked with her son regarding the mortgage. The communications to the loan company admittedly written by her are in evidence and appear rational and disclose full knowledge of the existence of the mortgage, with no suggestion of a question concerning its validity. She and her children continued to occupy and till the land and make payments on the loan until shortly before the mortgage was foreclosed.

Dr. D. W. Griffin, the medical superintendent of the Central Oklahoma State Hospital for some 30 years, after qualifying as an expert on mental diseases, testified that he had treated the alleged incompetent in his institution during the periods of her commitment since 1908.

He testified further:

"A. She is what we know as a manic depressive type of individual, that goes along and gets all right and returns back to her home, and goes along until another attack comes on, another cycle; then she is back again. In the meantime, however, those patients as a rule are in good health while they are at home. They are different from most any other class of individuals, because they are in good mental condition during this lucid interval. Q. During the lucid interval? A. Yes, sir. Q. Was it during the lucid intervals that she was paroled from the hospital? A. Yes, sir. Q. Why did she have to be recommitted? A. Another attack, another cycle, came on, and she would have to be recommitted. Q. Doctor, you have just testified that this lady was paroled October 2, 1916, and returned December 2, 1922. A. Yes, sir. Q. That is a period of six years and two months? A. Yes, sir. Q. The issue in this case is whether Mollie McMasters was mentally competent on November 22, 1922, to understand the nature of the transaction of the giving of a note and mortgage for $1,000 by herself and her husband, on their farm. I will ask you to assume that she signed the note and mortgage; then I will ask you to state whether or not in your opinion she was mentally competent to understand the nature of such transaction on said date? A. I think she was. * * * Q. Do you recall about when that was that you discussed this with her; how long ago? A. This morning. Q. This morning? A. Yes, sir. * * * Q. Assuming that she was a farm woman all of her life please state whether or not on November 22, 1922, she knew what a mortgage of a farm was? A. Yes, she did. Q. Dr. Griffin, does her ability to recall and discuss the giving of this note and mortgage back there 16 years ago have any significance to you as a medical man as to her mental competency to understand the nature of such transaction when it occurred? A. I think she did, because she talked to me about, as mentioned a few moments ago, this morning. Q. The question is what significance is it? Do you think it significant, if she can recall it, that you think she was competent at the time she signed the note and mortgage? A. Yes, sir. Q. Doctor, on account of these objections, I have to ask the question again; that is, what is the significance to you, as a medical man, of the fact that she can discuss the matter now, as to whether or not she was mentally competent to understand the nature of the transaction when she entered into it back there in 1922. In other words, what is the significance to you now that she can discuss it and recall it? A. Well, I think it is an indication that she certainly understood what she was doing at that time. Q. On November 22, 1922, was her mental trouble such a type that she would not understand the ordinary business affairs, such as the giving of a note and mortgage on a farm? Q. Did you understand the question, Doctor? A. Yes, I understand it; I think she was. Of course I didn't see her at that time and I couldn't testify what her mental condition was; but knowing her as I do, I rather think she understood it."

And on redirect examination Dr. Griffin testified as follows:

"Q. I don't know whether you and I understand each other on that question or not. I want to know what your opinion is as to whether her ability to discuss and recall the matter, recall and discuss it with you this morning, would indicate her condition at the time she signed the note and mortgage? A. Yes, sir, it would. A. It indicates to me that she knew what she was doing when she signed it."

Dr. Joseph A. Reiger, assistant physician at the hospital, after qualifying as an expert on mental diseases, stated that he had known Mrs. McMasters almost four years, and further testified as follows:

"Q. What is her mental trouble? A. She is suffering with what is known as manic depressive psychosis, a functional mental disorder. Q. What is that? A. It is a functional mental disorder, in which there is manifested either a retarded mental process and activity or exaggerated, over-active processes; psychomotor retardation or excitation. Q. Does that go from one phase into the other? A. It may. Q. They have lucid intervals and then excited intervals? A. Yes, sir, and depressive intervals at times. Q. Doctor, with Mollie McMasters' type of mental trouble, would her ability to recall and discuss matters and transactions

that occurred many years ago, be of any significance to you in determining whether she had the mental understanding to comprehend the nature of those transactions when they occurred? A. I don't think so. I may be a little confused on the question, it being so long. Q. I want to know whether, if she can discuss a matter now it would indicate to you whether she knew what she was doing when the matter happened several years ago? A. I think so. Q. I will ask you to state whether or not she has ever recalled and discussed with you the giving of a note and mortgage by herself and her husband on their farm years ago? A. She has. Q. About how long ago did she discuss that with you? A. I would estimate about six months ago. I don't remember exactly. Q. Now, Doctor, having in mind that she has recalled and discussed the giving of a note and mortgage on this farm in Stephens county in 1922, I will ask you to state whether or not in your opinion she was mentally competent in 1922 to understand the nature of the transaction when she entered into it? A. I rather think she understood the nature of the transaction, because I remember her telling me that she signed it under duress; that her husband threatened her because she objected to signing it. I can't say as to her judgment at that time, because I don't know her mental state at that time."

There is, of course, the possibility that Mrs. McMasters was completely without understanding of the nature and consequence of her act at the time she signed the mortgage. The testimony of those about her near the time is perhaps sufficient to create some doubt as to her understanding at the time, and the fact that she was recommitted to the hospital some two weeks thereafter further indicates the possibility and casts some suspicion on the state of her mental condition at the time. She, however, had never been judicially declared incompetent, and plaintiffs are faced with the burden of proving by the weight of the evidence that at the time of the execution of the mortgage she was entirely without understanding of the nature and consequence of her act. Sections 9402 and 9403, O. S. 1931, 15 Okla. St. Ann. §§ 22 and 23. In making such proof they must overcome the legal presumption of

sanity. Wilson v. Ferguson, 84 Okla. 79, 202 P. 500.

In Davidson v. National Aid Life Ass'n, 174 Okla. 155, 50 P. 2d 173, this court said:

"The presumption of sanity prevails until the contrary is shown. Upon this presumption the public freely deals one with another, and until there has been a judicial determination of incompetency, the contract of a person of unsound mind, but who is not entirely without understanding, is voidable and subject to rescission. This principle of law is statutory in this state. Section 9403, Okla. Stats. 1931, says:

" 'A conveyance or other contract of a person of unsound mind, but not entirely without understanding made before his incapacity has been judicially determined, is subject to rescission without prejudice to the rights of third persons, as provided in the article on extinction of contracts.' * * *

"It is well established in this jurisdiction that a contract made by a person whose mind is unsound, but who is not entirely without understanding when the contract was executed prior to the judicial determination of the incapacity of such person, is a contract that is voidable and not void. Maas v. Dunmyer, 21 Okla. 434, 96 P. 591. This court in a recent case, Canfield et al. v. Canfield et al., 167 Okla. 595, 31 P. 2d 149, has held:

" 'It is the general consensus of judicial opinion that mental incapacity, whether it be due to mere weakness of mind or actual insanity, is not in itself a sufficient basis for obtaining the cancellation of a written instrument, unless the state of idiocy or imbecility complained of is such that it rendered the afflicted individual incapable of understanding the nature and effect of the transaction at the time the instrument was executed.' "

We feel that the plaintiffs' evidence herein goes no further than to cast some doubt upon the question of her understanding at the time. All of such testimony was nonexpert and of uncertain value, Moors v. Sanford, supra, and it does not necessarily exclude the probability that she did understand the na-

338

ture and consequence of her act. Their testimony shows that she resisted her husband's request to sign for several days, which of itself is some indication of knowledge of the nature and consequences of the act of executing the mortgage. Other of plaintiffs' testimony is to the effect that subsequent to the execution of the mortgage and at a time when she admittedly understood what she was about, she discussed the same with members of her family and by mail communicated with the loan company concerning leniency in the matter of payments, thus disclosing that she recognized the existence and effect of the mortgage and professed no ignorance of her act in executing the same.

In addition to the weakness of plaintiffs' evidence, we have the testimony of well-known specialists in mental diseases who give it as their opinion that she understood the nature and consequence of her act at the time the mortgage was executed.

We are convinced that the evidence as a whole fails to meet the requirements of the law to constitute sufficient affirmative proof of the vital fact at issue. Monarch Loan Co. v. Shellenberger, 159 Okla. 247, 15 P. 2d 53; Walker v. Citizens Nat. Bank of Okmulgee, 165 Okla. 97, 25 P. 2d 68; In re Russell's Estate (Cal.) 210 P. 249.

Other questions are presented involving the procedure followed, and the rights of the various parties to present their respective claims and have them adjudicated in the trial court as there sought. We deem it not necessary to burden this opinion with a determination or any discussion thereof, in view of our conclusion above stated.

The judgment of the trial court is reversed, and the cause remanded, with directions to render judgment for the defendant.

BAYLESS, C. J., and OSBORN, GIBSON, and DAVISON, JJ., concur.