[Civ. No. 10611.    Third Dist.    Nov. 4, 1963.]

Estate of RICHARD N. TURPIN, Deceased. DIXIE LEONA SCOTT, Petitioner and Appellant, v. ARTHUR R. TURPIN, Contestant and Respondent.

Fred W. Burton and Burton & Hennessy for Petitioner and Appellant.

Mark M. Brawman for Contestant and Respondent.

VAN DYKE, J.*—This is an appeal from an order denying probate of a will in a contest tried before the court sitting without a jury.

The court made findings as follows: That when the will was made the testator was afflicted with senile dementia and was not competent to make a will; that the decedent was subject to irrational delusions and irrational fears with respect to his son and sole heir; and that the delusions and fears directly influenced the making and execution of the purported will. These findings are supported in the proof and therefore the order appealed from must be affirmed.

■■■ We state the evidence conformably to the rule governing reviews of factual findings. Decedent Richard N. Turpin died August 2, 1960, aged 83. He left a will dated May 27, 1960. Contestant Arthur R. Turpin, aged 60, was the only child of decedent who survived infancy. Petitioner Dixie Leona Scott was a niece of decedent, aged 70 years at the time of trial. The will specifically disinherited decedent's son and willed his entire estate to appellant. Between decedent and appellant there had been no contact for over 50 years save for a few overnight visits a number of years prior to the making of the will. For many years contestant and his wife had lived on a ranch with decedent and contestant's mother. There was a close family relationship. There was further an oral understanding at one time that the ranch would eventually go to contestant and his wife. Contestant's mother died in 1958. Thereafter personality and living habits of decedent underwent marked changes. He did not keep himself clean and urinated in his clothing; he wandered in his speech; he suffered a delusion that a man entered his house through a window that was in fact nailed shut. He talked of hiding money on the ranch, frequently changing the place of concealment and the amount concealed. He complained that the county treasurer withheld half his monthly old-age-pension checks. He had a delusion that his wife had been buried in a ditch and that she had appeared in the home yard after her death. He had hallucinations that he was being shot at. He was disoriented as to time and place and developed a blur in his speech. He suffered a fear that people were trying to take his ranch away from him. He became antagonistic toward his son and his son's wife. He told friends and neighbors that his son had knocked him down on the gravel driveway be-

---

*Retired Presiding Justice of the District Court of Appeal sitting pro tempore under assignment by the Chairman of the Judicial Council.

tween the two houses on the ranch and that as he rolled over he saw his son's wife standing in the door with a gun. He told a deputy sheriff that his son had struck him on various occasions but that he did not wish to sign a complaint for his son's arrest. He told another person that his son had stolen four or five hundred dollars out of the family Bible, had beat him, or threatened to beat him, and that decedent had a pistol and would shoot his son. He stated that his son was trying to get what he had, while he wanted it for his niece. Both the son and his wife denied the happening of these occurrences or the existence of any desire on the part of the son to take his father's property away from him, and in view of the findings of the court these matters must stand as delusions. They were described by a doctor as paranoid. In March 1960 decedent received a letter and funeral notice from his niece reporting the death and funeral of decedent's brother in January of that year. The son read the letter to decedent, who did not want it answered, and it was left on a table. On May 14, 1960, decedent demanded the letter and funeral notice from contestant's wife, stating that he wanted to go to the funeral. Although it was explained to him that the funeral had been held in January, he appeared not to understand and ordered his daughter-in-law off the ranch because she did not let him go to the funeral. He complained to the sheriff's office that a letter was being withheld from him, and on the following morning a deputy sheriff came to the ranch to inquire about the complaint. This so upset the daughter-in-law that she decided to leave the ranch for a while. Contestant told his father that his wife wanted to go away but that he would be back as soon as he got her "quieted down." The two left the ranch shortly after the deputy sheriff's visit, which was on Monday, May 16, 1960. A few days later the son returned to the ranch but did not find his father. Shortly thereafter he received information that decedent had gone to Pendleton, Oregon, with petitioner. On Sunday, May 15, 1960, decedent contacted his attorney for assistance in locating his niece. He told the attorney he wanted to give one-half of his ranch to his niece and that she could have the other half when he died. On May 22, 1960, after suffering a minor automobile accident, decedent told a patrol officer that his son had beat him up and that he wanted to contact his niece. Through the officer contact was established and on May 24th petitioner arrived in Yreka. She testified that her uncle told her that his son had knocked him

down when he refused to sign the ranch over; that as he rolled over he saw the son's wife in the door with a gun in her hand. The next day petitioner took decedent to the office of the attorney for the preparation of a will, and the will was executed May 27, 1960. Petitioner took decedent to her home in Pendleton. She testified at the trial that decedent was afraid of his son and that while at Pendleton, and on a number of occasions, referring to his son, he said: "He will beat me to death if he finds me up here." He also expressed fear that his son would kill a dog he had left with a neighbor and in July returned to Yreka with petitioner because of his concern over the dog. In May the decedent told his attorney's father that his son had struck him and knocked him to the ground during a quarrel about dividing the ranch between the son and the niece, and said the son was once in the ring and knew how to hit. He told another person that his son had knocked him down, and he did not want his son to have "any damn thing." To another person he said his son wanted his pension money and hit him when he refused to hand it over. On May 16th he told a deputy sheriff that he knew his son had letters from his niece and was keeping them from him, and that he, decedent, wanted to divide his property half to his son and half to his niece. The next day when the deputy sheriff again talked to him decedent stated that his son had hit him after the deputy left the previous day and that it had happened before. Decedent was described as being a small man, about 5 feet 1 inch or 5 feet 2 inches in height, weighing between 100 and 120 pounds, stooped over and feeble. Just before signing his will he told his attorney that his son was to have nothing, saying, "Whenever a boy hits his own father, he doesn't deserve anything."

We quote the following from Summary of California Law by Witkin, page 3064, as applicable to this case: "Most of the decisions denying probate on grounds of incompetency involve delusions. As pointed out above (§ 74), a mere unfounded belief or prejudice does not establish incompetency, but a belief so irrational that no normal person could have it may amount to an insane delusion sufficient to destroy testamentary capacity. Examples are: the testator's groundless belief that his wife was unfaithful (*Estate of Mickelson* (1940) 37 Cal.App.2d 450 [99 P.2d 687]); that his child was illegitimate (*Estate of Mickelson, supra; Estate of Russell* (1922) 189 Cal. 759, 770 [210 P. 249]); that his brother was robbing and harassing him. . . ."

The evidence is sufficient to support a finding that

for some time prior to the time his will was made the testator came under the influence of sustained delusions of persecution by his son, of beatings administered, of money stolen, and of plan and purpose to divest him of his property. His own statement as to the reason for disinheriting his son sufficiently establishes that his will was the product of his delusions.

The court found general testamentary incapacity and this finding is supported by what has been related, but in addition his own personal physician and a psychiatrist gave it as their opinion that decedent was incompetent mentally to make a will.

The order appealed from is affirmed.

Pierce, P. J., and Schottky, J., concurred.