[L. A. No. 2380. Department Two.—November 1, 1909.]

## In the Matter of the Estate of WILLIAM D. CARITHERS, Deceased.

NEW TRIAL—WAIVER OF MOTION—WANT OF ORAL ARGUMENT.—The mere failure to present oral argument on a motion for a new trial, when the motion was made upon the same day as the settlement of the bill of exceptions, is not a waiver of the motion.

WILL—UNSOUNDNESS OF MIND—ALCOHOLIC DEMENTIA—INSUFFICIENCY OF EVIDENCE.—Notwithstanding the evidence shows that a testator had gross habits of indulgence in intoxicating liquors, a verdict based on the theory that he was of unsound mind at the date of the execution of the will, by reason of alcoholic dementia, is not sustained by the evidence, when the attorney who drew the will and the attesting witnesses each positively testified that he was possessed of testamentary capacity when he signed the will, and the only evidence to the contrary was that of physicians whose testimony was largely speculative and founded entirely upon knowledge gained subsequent to the date of the will, and of other witnesses whose testimony as to his condition when they saw him at other times was just as consistent with the theory of temporary drunkenness as of permanent mental derangement.

ID.—UNDUE INFLUENCE—INTEREST AND OPPORTUNITY OF WIFE.—To justify the refusal to probate a will on the ground of undue influence, proof must be had of a pressure which overpowered the mind and bore down the volition of the testator at the very time the will was made. Mere evidence of a wife's interest and possible opportunity to sway her husband's mind, is insufficient to defeat his will in her favor.

APPEAL from a judgment of the Superior Court of Los Angeles County and from an order refusing a new trial. Walter Bordwell, Judge.

The facts are stated in the opinion of the court.

Morton & Pruitt, and E. S. Williams, for Appellant.

Stephens & Stephens, William A. Bowles, and Grove E. Walter, for Respondents.

MELVIN, J.—Appeal from a judgment entered after verdict of a jury revoking probate of the last will of William D. Carithers, deceased, and from an order denying appellant's

motion for a new trial. The contention is made on behalf of respondent that, by the failure to argue orally the motion for new trial, the said motion was waived. This is an interesting question which, in view of the conclusions reached by us with reference to the appeal from the judgment, need not be here considered at great length. This court has decided recently, however, that mere failure to present oral argument on the motion for a new trial is not a waiver of said motion. We think that the circumstances in this case and the fact that the motion for the new trial was made upon the very day of the settlement of the bill of exceptions bring it clearly within the rule announced in *Boin* v. *Spreckels Sugar Co.*, 155 Cal. 612, [102 Pac. 939].

By stipulation but two forms of verdict were submitted to the jury. One was as follows: "Did the deceased, William D. Carithers, know and understand on the evening of August 18, 1906, that he was then making his will and leaving his property to the parties therein named?" The other was a general form of verdict to be signed by the foreman after finding for plaintiff or defendant. To the question calling for special verdict, the jury returned a negative answer, and the general verdict was in favor of the plaintiff. The form of the verdict makes it necessary for us to determine its sufficiency or error in view of all the grounds of contest, which are: 1. Mental incompetency; 2. Undue influence; and 3. Lack of due execution. If the general verdict may be sustained upon any one of the above grounds, the judgment must be affirmed.

We will first consider the evidence with reference to the first ground of contest mentioned above, as the special verdict was evidently based upon the belief of the jurors that the testator was of unsound mind at the date of the execution of the will. It appears from the testimony of several witnesses, and seems to be conceded by all parties to this proceeding, that prior to taking up his residence in California, William D. Carithers, who was a prosperous banker and merchant in Illinois, was a regular drinker of alcoholic liquors but not addicted to the excessive use of such stimulants. After he came to California his habits grew worse and he was frequently intoxicated for weeks at a time. In 1902 he married the proponent, but marriage did not seem to im-

prove his habits. He continued to drink heavily in spite of his wife's efforts to bring about a reformation. He was taken for treatment to an institution for the care of those addicted to the improper use of liquor, and was also for a time in a home where Christian Science was practiced. Neither form of treatment availed, and he died on October 17, 1906, not quite two months after the execution of his purported last will, the cause of death being acute alcoholism. He was fifty-seven years of age at the time of his death. About twelve days after the execution of the will he was taken to a hospital, and from that time until his death was under medical treatment.

Contestants called two physicians, Doctors Bassett and Justice. The former, in answer to a hypothetical question, gave it as his opinion that the person therein described would be insane, and expressed the belief that Mr. Carithers, whom these physicians saw for the first time when he was taken to the hospital some days after the signing of the testament, was then demented and incapable of making a will. A critical examination of the testimony of the physician, however, fails to reveal anything in the condition of his patient which would not be accounted for by the fact that Carithers had entered upon a fresh debauch after the execution of the will. In other words, the witness failed to relate any circumstances that might not well comport with the theory that Carithers was merely suffering from the usual effects of over indulgence in liquor by a man of his age and physical condition, rather than a permanent state of insanity which to avoid the will must have existed on August 18, 1906, when the will was prepared, signed, and attested. Doctor Justice testified that, from the specifications of the hypothetical question the man described must have been insane, and that testator, whom he saw about ten days after August 18, 1906, was at that time an "alcoholic dement," and must have been one for a period extending back further than the date of the will. Neither physician saw the patient on or prior to the eighteenth day of August, 1906. Benjamin McCartney, a lifelong friend of the decedent, who was called by the contestants, testified that Mr. Carithers was of unsound mind in the summer of 1906, but he seems to have limited that judgment to periods when the testator was actually drunk. He stated that when not

too drunk to attend to business, Mr. Carithers possessed a fairly bright and active mind. Doctor Guy Elder, witness for contestants, who before he was a physician had acted as a nurse for Mr. Carithers, testified that when he first saw the patient at the Emergency hospital during the first week in September, the latter was drunk. Later, in the month of October, when he was called to nurse the testator at the latter's home, he found that, according to his judgment, Mr. Carithers's mind was unbalanced. Regarding the mental condition of the testator during the period of his stay at the Emergency hospital, however, he testified as follows: "When I went there he was heavily under the influence of liquor. I sobered him up then. After he was sobered up I considered his condition of mind as good as anybody's. He seemed to be in perfect possession of all his faculties and during the ten days that I was there with him—during all that time—he seemed to be in possession of all his faculties." Other witnesses described particular eccentric acts of Mr. Carithers, but their testimony throws no light on the subject of the sanity or insanity of testator at the time when he performed the testamentary act.

There is nothing in the will itself to raise any suspicion respecting the mental condition of the testator except perhaps the signature which, according to the testimony, seems to have been badly written and not in his usual chirography. It was explained, however, that he signed his name while he was sitting on the edge of his bed, and without having adequate support beneath the paper. These circumstances might easily account for the bad penmanship. The will itself is a natural one, containing nothing essentially unjust. There is a small devise to a sister, and the residue of the property is devised and bequeathed to his wife. The testament was drafted by Mr. Lynn Helm, a reputable member of the bar, who had acted as Mr. Carithers's attorney for a long time. He emphatically asserted at the trial that Mr. Carithers was of sound and disposing mind when the will was prepared and executed. The most significant facts concerning the writing and signing of the will may best be given in Mr. Helm's own words: "Mr. Carithers was lying in bed, and I said to him, 'How do you do, Mr. Carithers? Are you sick? I am sorry to see you sick.' He said 'No, Helm, I am not sick. I am just getting

over a drunk.' I said 'I did not know you ever drank.' He said 'Yes, you did too.' I said 'No, I didn't.' 'Well,' he said, 'I am all right now, and I want to see you about some business.' I said 'How long has this been,' and he said 'Oh, I have been here the best part of a week, but I am all right now and I want you to draw my will. Can you do it?' I hesitated a minute and I said 'I don't know, what do you want to do?' He said 'I want to leave everything to my wife.' I said 'That is easy, I can do that.' He and I were alone in the room at the time and I said 'What do you want to do?' He said 'I want to give my property to my wife and I want to make her the executrix.' I said 'I can do that if I can have a piece of paper. I can write it out here,' and he said 'You call Mrs. Carithers.' He called up to her himself and in a moment or so she came to the door and she was leaning over the foot of the bed. It was a very narrow room. I was sitting between the side of the bed and the wall and there was hardly room for her to have passed me between where I was sitting and the bed, and she leaned over the foot of the bed and he said to her 'Dell, get the lawyer a pencil and some paper. I want him to draw my will.' She hesitated a minute and went out and brought me a sheet or pad of paper and she came in and said 'What are you going to do?' And he said 'I am going to draw my will. I am going to leave you everything,' and she hesitated a minute and sort of drew back and he said 'Yes, I am going—I have made up my mind I am going to leave you everything. You are the only one who takes care for me or does anything for me and no one else cares for me.' She said 'Well, aren't you going to remember any of your relatives?' And he said 'Oh, I don't know, you can do that just as well as I can. If anything happens to me, why you can give any one of them a deed to anything as well as I can.' She said 'No, I don't want it that way. If you are going to do anything of that kind you had better do it now. Aren't you going to remember your sister, Mary Hipsley?' And he said 'Well, if you want me to I will give her something.' Then he talked about his property; he talked about the Kansas property and then he said, 'I will tell you, I can leave her that piece at Table Grove.' I said 'How are you going to describe it,' and he said 'I will describe it as the same property I have with my brother John. I had

a half interest with him.' And I said 'Did you ever have any other property with your brother John at Table Grove,' and he said 'No, I never did.' 'Well,' I said, 'that would be a good description, to describe it as the property in which you had a half interest with your brother John.' He said 'All right, you can describe it then as the half interest in the property in the store and building at Table Grove which I owned with my brother John.' I said 'All right,' and so I then took the pad and wrote the will and I wrote it with pencil. I had an indelible pencil in my pocket and I wrote it with that and after I had finished I read it over to Mr. Carithers.'' The lawyer's graphic account of these occurrences on August 18, 1906, tends to show not only that the testator was fully conscious of what he was doing and that he acted rationally, but that his wife was not seeking to influence him unduly in the disposition of his property. Mr. Vogel and Mrs. Strong, the witnesses to the will, both said Mr. Carithers was sane, that on August 18, 1906, he was of sound and disposing mind; and the testimony of both of these neighbors tends to show that, except when directly under the influence of liquor, he was a man of average intellect. There was much other evidence furnished by laymen and physicians, respecting Mr. Carithers's sanity, but we need not reproduce it here. The great question is whether or not there is sufficient evidence to sustain the verdict upon the ground of testator's permanent insanity, or of his temporary inability to understand that he was making a will and leaving his property to the persons named therein. We do not think that the contestants produced sufficient evidence of *facts* to justify the jury's verdict. It is true that gross habits of indulgence in strong drink were disclosed, but there was nothing which tended to break the force of the positive testimony of the attorney and the attesting witnesses that Carithers was possessed of testamentary. capacity when he signed the will. The testimony of the physicians was largely speculative and was founded entirely upon knowledge gained subsequent to August 18, 1906, while the other witnesses depended upon facts which were just as consistent with the theory of temporary drunkenness as of permanent mental derangement. Such evidence is not adequate for the overthrowing of the provisions of a will, *In re Wilson*, 117 Cal. 262, [49 Pac. 176], lays down the rule for cases

of this kind very clearly as follows: "While evidence of the condition of the testator's mind both before and after the date of the testamentary act is admissible, yet it is important only as it bears upon that condition at the very time of the execution of the will. It unfortunately is often the case that exceedingly bright and strong-minded people are addicted to the excessive use of alcoholic drinks, and are frequently intoxicated; and to hold that the wills of such persons, although shown to have been executed when they were in full possession of testamentary capacity can be upset by a jury upon mere proof of such drinking habit, would be to carry the rule of 'conflicting evidence' beyond all reasonable bounds.''

There was no evidence of lack of due execution, so we need not consider further that ground of contest. Upon the issue of undue influence there was some evidence that Mrs. Carithers had sought to keep certain friends from communicating with her husband, and that she had expressed to Doctor Justice a fear that Mr. McCartney and Mr. Helm might induce him to make some change in his papers. There was practically nothing shown beyond interest and possible opportunity of the wife to sway her husband's mind. Much more is needed to make out a case of undue influence. Proof must be had of a pressure which overpowered the mind and bore down the volition of the testator at the very time the will was made. (*Estate of Nelson*, 132 Cal. 182, [64 Pac. 294]; *Estate of Calef*, 139 Cal. 673, [73 Pac. 539]; *Estate of Black*, 132 Cal. 392, [64 Pac. 695]; *Estate of Donovan*, 140 Cal. 390, [73 Pac. 1081].)

Appellant calls our attention to other alleged errors, but in view of the conclusion which we have reached respecting the sufficiency of the evidence we do not deem it necessary to consider them.

The judgment and order are reversed.

Henshaw, J., and Lorigan, J., concurred.

Hearing in Bank denied.