[Civ. No. 10993.  First Appellate District, Division Two.—February 24, 1939.]

In the Matter of the Estate of THOMASINE H. ALBERTSON, Deceased.  LOIS ELIZABETH INMAN et al., Respondents, v. EARL L. PALTENGHI, etc., et al., Appellants.

Jackson & McCredie and Russell P. Tyler for Appellants.

Rea, Free & Jacka for Respondents.

STURTEVANT, J.—The decedent died March 11, 1934. Later a document purporting to be her will, dated February 27, 1934, was admitted to probate. Thereafter L. E. Inman, B. F. Barnhart, V. Warren, and C. T. Headen, three sisters and a brother, being the children of Mrs. Eva Headen the surviving widow of George Headen, deceased, who was a half brother of the testatrix, appeared and filed a contest. Two of the legatees named in the purported will appeared and answered. By its verdict the jury found (1) that the decedent was not of sound mind at the time the purported will was executed; (2) that she was not able to understand the nature of the act she was performing, to understand and see the nature and situation of her property, to remember and understand her relations to the persons who had claims on her bounty and who were affected by the provisions of said will; (3) and that the alleged will was executed by decedent while acting under undue influence. Thereafter the proponents made a motion for judgment notwithstanding the verdict. The trial court granted the motion in so far as it was based on the third division of the verdict as returned by the jury. As to the other portions of the verdict the motion was denied. Thereafter the proponents made a motion for a new trial. That motion was denied by operation of law. From said orders and judgment the proponents have appealed.

The first point made by the proponents is that the verdict is not supported by the evidence, however we think said contention may not be sustained. The contestants presented their case in such a manner as to present two different theories. They claimed the insanity of the decedent was of such a broad character as to establish mental incompetency generally. They also claimed it was a form of insanity under

which the testatrix was a victim of hallucinations and delusions which had a direct influence upon the making of the will.

Taking up the first theory the record discloses that in the month of October, 1932, the decedent was about seventy years of age and was and had been for some time in ill health. Her home was on a farm adjacent to the city of Santa Clara in Santa Clara County. At that place she consulted local physicians, Dr. Beattie and Dr. Bothe. The latter caused her to be taken to the French Hospital in San Francisco where, on October 13, 1932, she was treated by Dr. Janes. Later she returned to her home but not recovered. In January, 1934, she returned to San Francisco and again consulted Dr. Janes. Acting upon his suggestion she entered the hospital again on March 1, 1934. The will under attack was an holographic will dated February 27, 1934. She died on March 11, 1934. After the death of the testatrix an autopsy was performed by Dr. Janes and Dr. J. B. McNaught. The report of the autopsy was full and complete. On the trial Dr. Janes was called as a witness by the proponents of the will. During an extended examination he made a very complete statement of the conditions he found. The autopsy disclosed the following: 1. Leukemia, myelogenic; 2. Anemia secondary; 3. Splenomegalia; 4. Hemorrhage, gastro-intestinal mucosa; 5. Arteriosclerosis, general; 6. Arteriosclerosis, local, renal arteries with scars in kidney; 7. Arteriosclerosis, local aorta; 8. Tuberculosis pulmonary, apical, healed; 9. Accessory spleen; 10. Fibromyoma of uterus (calcified); 11. Atrophy of pelvic organs; 12. Appendicitis, chronic, obliterative; 13. Diverticula, large bowel, multiple. Dr. Janes testified the first seven were causes of death. He also testified as follows: The decedent called at his office on February 13, 1934. He made something of an examination and asked her to return, which she did on February 21st. At that time he thought she was in a serious condition and directed her to go to a hospital. He next saw the patient on March 1, 1934, at the French Hospital. She was suffering from acute infection. She had an enlarged spleen. The enlargement was on the left side and the patient complained more or less of her stomach. He then diagnosed the case as enlarged spleen and possibility of cancer of the stomach. Prior to March 11, 1934, he saw the patient once a day and sometimes

three times a day. The last two days she was delirious. The immediate cause of death was leukemia and splenomegalia, but neither one affects the mind. Leukemia is an excessive amount of white corpuscles in the blood. An excessive amount of red corpuscles would affect the mind. Splenomegalia is enlargement of the spleen but enlargement of the spleen would have no effect on the mind. The spleen manufactures white blood corpuscles and there is possibility of infection. Enlargement of the spleen is caused by infection. It could be caused by leukemia or by anemia and it is gradual. Anemia is caused by lack of oxygen. When there is a lack of oxygen the blood is affected first, then the nervous system. There are more blood vessels in the brain than in any other part of the body and with a shortage of oxygen those blood vessels would be affected. There is a great accumulation of blood in the brain. The function of the blood is to transmit food to the different organs of the body. That is the way the body is nourished. Anemia is a decrease of red blood cells, hemoglobin, in the blood. The red blood cells carry the oxygen and when there is a decrease in them there is a decrease in oxygen which causes a general run down condition of the parts affected. The brain would be affected like any other part of the body but the nervous system is the first part of the body to be affected by a lack of oxygen and there would be a general run down condition of all the organs. Hemorrhage, gastro intestinal mucosa was an anatomical cause of death. Hemorrhage is a manifestation of leukemia at the end of it. Patients afflicted with leukemia generally have hemorrhage of the stomach before death. A hemorrhage in 1931 would indicate the patient was run down. It might be a manifestation of anemia. Gastro intestinal mucosa means the mucous membrane of the intestines or stomach. One cause of death was hemorrhage of the lining of the stomach. The first time the witness discovered the patient had hemorrhage of the stomach was when the deceased went to his office February 21, 1934. He considered the fact very serious. Arteriosclerosis general was another cause of death. That affliction is a hardening of the coat of the arteries about the body. It is the arteries losing their contractual power on account of hardening. The organs of the body get the necessary blood but it takes longer for it to get to them. It diminishes the supply of blood

to the organs and causes a run down condition of those organs because they are deprived of the necessary food. Among the organs so affected would be the brain. General arteriosclerosis affects the organs of the body in the way of circulation. That means a lack of blood getting to the organs. Arteriosclerosis or anything that prevents the blood from getting to the brain would be a cause or help to be a factor of forgetfulness in old people. It would be a factor in becoming childish—more so with a person seventy years of age than a person thirty. Arteriosclerosis, local, renal arteries with scars in kidney was another cause of death. It is a general arteriosclerosis involving the kidneys. The kidneys of the deceased were affected with arteriosclerosis. Arteriosclerosis, local, aorta was another cause of death. It means the aorta artery was sclerotic. It is the principal artery of the heart. The condition is serious. It takes some few years to develop. If the aorta is affected it means the supply of blood is cut down from the organs of the body. It would cause a run down condition of the body, difficulty in breathing, making the patient feel tired and having a feeling of exhaustion. It would also cause an enlargement of the heart. Tuberculosis, pulmonary, apical, healed, was another cause of death. It means tuberculosis of the lungs, on the apex, healed. It may be an old cavity that was healed up. It might have been many years back. Tuberculosis would have a weakening condition on the body, causing a loss of weight, shortness of breath, and a general run down condition. Appendicitis, chronic, obliterated, means the patient had had chronic appendicitis but the appendix had been obliterated. There was none. Before it was obliterated the appendix would be a source of focal infection. Of the thirteen causes of death the opinion of the witness was that the primary cause was leukemia and that hemorrhage gastro intestinal and general arteriosclerosis were the secondary causes. Leukemia was the most serious. The decedent practically bled to death from the stomach. Leukemia is progressive and in the end it is a final breakdown of the mental and nervous system. That is the case when death draws near.

In support of their other theory the contestants introduced evidence of specific facts relating to the health, acts, and statements of the deceased. They introduced evidence that in 1925 she suffered a breakdown, was taken to the Livermore

Sanitarium for rest and treatment, and at that time she spoke incoherently and did not recognize a friend who had known her for many years. In August, 1928, she wrote a lengthy letter regarding the acts and conduct of the members of her family. Nearly all of the statements contained in the letter were not true but all of the statements tended to show the deceased believed the relatives mentioned were most unfriendly toward her. In 1930 her health was such that she consulted Dr. Beattie and he testified at that time she was suffering from a nose bleed which did not respond to treatment and which indicated a secondary anemia. She was feeling very badly, lost weight, and remained in the hospital about one month. In the same year she did many acts showing she was very suspicious not only of the persons about her but of outsiders, and complained that people were talking about her. She cried frequently without cause and asserted her deceased husband was hovering about her and influencing her conduct. During the same time she caused locks to be placed on her gates that people might not enter her farm. During these periods she failed to recognize her immediate neighbors and persons whom she had known for many years. In March, 1931, she was again afflicted with secondary anemia and other ailments that caused her to remain in the hospital for over two months. During that time she was somewhat irrational and in a very nervous state. While in the hospital, contrary to the instructions of the attendants, she would get out of bed and wander around in the hospital. She was ill again within a month after she left the hospital and her condition did not seem to improve. In 1928, 1931, 1933, and in the early part of 1934, she made statements to the effect that she was alone in the world and had no relatives, whereas the truth was she had several blood relatives and relatives by marriage. In 1932 she was again in the hospital complaining of the effects of a fall, but she also complained of being tired and of suffering pain in her stomach, and shortness of breath. There was also evidence that from 1925 down to the date of her death she was very penurious although she had an estate worth about $50,000. The fact further appeared that in the will under attack she left the greater part of her estate to Earl L. Paltenghi, one of the proponents. He was in no manner related to her, was

only slightly known to her, but was the son-in-law of Dr. Bothe who at one time was her physician.

The contestants called Dr. Will Rebec as an expert. To him they propounded a long hypothetical question. That question recited among others the foregoing facts, including the report of the autopsy. In reply the doctor testified that the decedent at the time she made the purported will was of unsound mind—she was suffering from senile dementia, that is, she was insane. Taking up each one of the afflictions set forth in the report of the autopsy the witness described its effects on the body and the effect of the diseased organs of the body on the nervous system. He described in detail the nature of arteriosclerosis; that it results in a deposit of calcium in the tissues of the arteries; that the deposit is permanent; that, in the case of the decedent, the condition was chronic, and that it was progressive. He stated such facts as would show the mentality of the patient would be lessened in proportion to the progress of the affliction and that the progress thereof depended upon all of the facts which were presented for the determination of the jury. After the cause had been submitted the jury found the facts against the proponents. Giving effect to the facts above recited, we think it is clear it may not be said the verdict was not supported by the evidence, nor that the verdict does not support the judgment.

The next point made by the proponents is that the contestants failed to serve the citation on all of the beneficiaries named in the purported will. In reply to that point it is sufficient to state the record does not disclose who were served or who were not served.

It is next contended that counsel for contestants were guilty of prejudicial statements and misconduct. In support of this assertion proponents quote questions asked by, or statements made by counsel for contestants. The record shows that in some instances no objection was made in the trial court. In other instances proponents made an objection and it was sustained. In other instances there was no assignment of error and the court was not asked to rule thereon. The court was not asked to admonish the jury to disregard the erroneous conduct, if any. There was no failure on the part of the court to grant a request to admonish counsel nor to rule on objections duly made. On the record as made the

point may not be sustained. Proponents cite and rely on *People* v. *Edgar*, 34 Cal. App. 459 [167 Pac. 891]. But the rule in that case is not applicable to the record presented in the instant case.

It is next asserted that the trial court erroneously received evidence of statements made by Dr. A. C. Bothe. That assertion arises out of the following facts. The contestants had alleged that the purported will was executed under undue influence. At an early date they announced they expected to prove that Dr. A. C. Bothe and his wife, and Earl L. Paltenghi, their son-in-law, entered into a conspiracy to obtain title to the property of the deceased and that the will was the outgrowth of said conspiracy. In presenting that theory the contestants introduced in evidence many declarations of Dr. A. C. Bothe not made within the hearing of the deceased. It is those declarations of which they now complain. There is no merit in the contention. The proponents claim the contestants had not pleaded a conspiracy and therefore said declarations were hearsay. Assuming, but not deciding, that the contestants had not pleaded a conspiracy, nevertheless, as we understand the record, they had asked permission to do so and the trial court had ruled that later they might ask for permission to amend to conform to the proof. At a later date, on motion duly made, all of the evidence complained of was stricken out. Furthermore, when a motion for judgment notwithstanding the verdict was made, the motion was granted as to the count pleading *undue influence*. As to the other counts the admission of the evidence complained of was wholly immaterial and nothing appears in the record showing it was prejudicial to the rights of the proponents.

Under the heading "Other Prejudicial Statements and Rulings" the proponents list "Miscellaneous Errors". We have examined the record. We find nothing therein presenting anything purporting to be prejudicial error. Furthermore, the alleged irregularities were not called to the attention of the trial court and it was not asked to rule thereon.

Finally the proponents contend the trial court erred in denying the proponents' motion for a directed verdict and later denying their motion for judgment notwithstanding the verdict on the issue of unsoundness of mind. We think they are mistaken. Our reasons are clearly set forth hereinabove

where we discussed the first point made by the proponents. In their notice of appeal the proponents attempted to appeal from each of the orders herein last mentioned. They are not appealable orders. (Code Civ. Proc., sec. 963.) But they may be reviewed on an appeal from the judgment. (Code Civ. Proc., sec. 956.) We have so reviewed them. Therefore the appeal from said orders should be and it is dismissed.

The judgment appealed from is affirmed.

Nourse, P. J., and Spence, J., concurred.

A petition by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on April 24, 1939.