[Sac. No. 5300. In Bank.—November 12, 1940.]

In the Matter of the Estate of HOBART L. ARNOLD, Deceased. EARL W. PETERSON, Appellant, v. VERA L. LOGAN et al., as Executrices, etc., Respondents.

Geary & Geary and C. J. Tauzer for Appellant.

Barrett & McConnell and A. Dal Thomson for Respondents.

CURTIS, J.—Hobart L. Arnold died on June 3, 1937, leaving what purported to be an holographic will, dated May 6, 1936, which reads as follows:

"May 6th, 1936
"I, Hobart L. Arnold of Santa Rosa Sonoma County California, being of sound and disposing mind and memory, and not acting under undue influence of any person whomsoever, do make, publish and declare this to be my last Will and testament. I am single. I have no children.

"I do give and bequeath by property to the persons named in this will.

"To Earl W. Peterson of Modesto One Thousand Dollars. To Walter Staley of South Laguna Orange County, One Thousand Dollars. To Florence Wells Lancini One Thousand Dollars. To Dresse Wells Five Hundred Dollars. To Lois Hardisty of Santa Rosa Five Hundred Dollars. To Mabel Baudau of Windsor One Thousand Dollars. To Mrs. M. A. Parrish of 641 Sonoma Ave Santa Rosa One Thousand Dollars. To Frances Carrington of Rincon Valley and Vera Logan of 925 Wright st. Santa Rosa I leave the rest of my estate to share alike of what Stocks, Bonds Real estate Personal or whatever I may own at the time of my death. I appoint Frances Carrington and Vera Logan as Executrixs of my Estate without bonds.

"Signed this 6th day of May, 1936.

"HOBART L. ARNOLD."

The decedent was a widower at the time of his death. He left no children or other descendants, and his nearest relative was the said Earl W. Peterson, a nephew of said deceased, and, as stated above, one of the beneficiaries under said will.

Upon the filing of this instrument for probate as the last will of said deceased by Frances Carrington and Vera Logan, a contest was instituted by the nephew Earl W. Peterson upon the ground of undue influence, and unsoundness of mind of said deceased. At the trial of said contest, the court granted a nonsuit as to the issue of undue influence and denied a motion for nonsuit as to the issue of unsoundness of mind. Evidence was introduced by the respective parties in support of the issue of unsoundness of mind and at the close thereof counsel for proponents, Frances Carrington and Vera Logan, moved the court for a directed verdict in favor of proponents, which motion was denied by the court.

After a verdict of the jury in favor of the contestant finding the deceased not to be of sound and disposing mind, the court granted a motion for judgment in favor of proponents notwithstanding the verdict, and entered an order admitting the purported will to probate as the last will and testament of said deceased, and appointing proponents the executrices of said will. From this judgment the contestant has appealed on the ground that the court erred in granting a nonsuit as to the issue of undue influence and also erred in granting proponents' motion for judgment notwithstanding the verdict of the jury in favor of contestant as to the issue of unsoundness of mind. It is the contention of the contestant that there is sufficient substantial evidence in support of each of these two issues to entitle the contestant to have these two issues passed upon by the jury.

We will first direct our discussion to the order granting proponents' motion for a nonsuit. The rule applicable to motions of this character is well established and was correctly stated in our recent decision in the *Estate of Flood*, 217 Cal. 763 [21 Pac. (2d) 579], where, in an opinion written by Mr. Justice Langdon, it is said (p. 768) : ''It has become the established law of this State that the power of the Court to direct a verdict is absolutely the same as the power of the Court to grant a nonsuit. A nonsuit or a directed verdict may be granted 'only when, disregarding conflicting evidence and giving to plaintiff's evidence all the value to

which it is legally entitled, herein indulging in every legiti- mate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of plaintiff if such a verdict were given'.''

This rule has been approved and followed by this court so often that it seems almost unnecessary to again refer to it. Among the many cases that have expressly sanctioned this rule, the following may be listed: *Umsted* v. *Scofield Eng. Const. Co.*, 203 Cal. 224, 228 [263 Pac. 799]; *Newson* v. *Hawley*, 205 Cal. 188 [270 Pac. 364]; *Mitchell Camera Corp.* v. *Fox Film Corp.*, 8 Cal. (2d) 192, 197 [64 Pac. (2d) 946].

 In an action to set aside a will of a deceased person on the ground of undue influence, it is necessary to show that the influence was such as, in effect, to destroy the testator's free agency and substitute for his own another person's will. (*Estate of Motz,* 136 Cal. 558, 583 [69 Pac. 294].) Evidence must be produced that pressure was brought to bear directly upon the testamentary act. (*In re McDevitt,* 95 Cal. 17, 33 [30 Pac. 101].) Mere general influence, however strong and controlling, not brought to bear upon the testamentary act, is not enough; it must be influence used directly to procure the will, and must amount to *coercion* destroying free agency on the part of the testator. (*Estate of Keegan,* 139 Cal. 123, 127 [72 Pac. 828].) It is further held that mere opportunity to influence the mind of the testator, even coupled with an interest or a motive to do so, is not sufficient. (*Estate of Easton,* 140 Cal. App. 367, 371 [35 Pac. (2d) 614].)

''The unbroken rule in this state is that courts must refuse to set aside the solemnly executed will of a deceased person upon the ground of undue influence unless there be proof of 'a pressure which overpowered the mind and bore down the volition of the testator at the very time the will was made'.'' (*Estate of Gleason,* 164 Cal. 756, 765 [130 Pac. 872].)

We will examine the evidence in this case adduced on behalf of this contestant in an effort to ascertain, in the light of the above ruling, whether it was sufficient to require the court to submit to the jury the issue of undue influence.

It is the contention of the contestant that the residuary legatees under said will so unduly and improperly influenced the testator to make said will in their favor as to the residue of this estate as to render the will of no legal effect. The

amount of the estate, which the two residuary legatees would receive, is at least $20,000. Neither of these two women was related to the testator either by marriage or consanguinity, while the contestant was his nephew and his only heir at law. Hobart L. Arnold, at the time of his death, was living at the home of the proponent, Vera L. Logan. On that day Mrs. Logan and a man named Wedell had gone to Oakland and when they returned to her home in Santa Rosa, they found Arnold lying on the bed in his bedroom dead. Whether he died as a result of the excessive use of intoxicating liquor or not is an unsolved question in the case. The cause of his death is not, however, of any material consequence. Mr. Wedell searched Arnold's body and took possession of what money he had which was only a few dollars. Mrs. Logan took a billfold from one of Arnold's pockets and took it to an attorney who opened it and found, in an envelope therein, the will which is now the subject of this controversy. The will as noted above bore date of May 6, 1936, over a year prior to the time of Arnold's death.

Respecting the claim of undue influence over the testator by proponent Frances Carrington, there is absolutely no evidence in the record of this case to support such claim. Mr. and Mrs. Carrington were old friends of Mr. and Mrs. Arnold, before the death of Mrs. Arnold. The Arnolds frequently visited the Carrington home and were greatly interested in the Carrington children. This friendship between the Arnolds and the Carringtons continued after the death of Mrs. Arnold and Arnold made frequent visits after his wife's death, to the Carringtons and their children. A short time before Arnold's death, the friendly relations between him and Mr. Carrington were interrupted by some misunderstanding between them respecting a business matter. But this break in their friendship did not extend to Mrs. Carrington, and Arnold continued to pay occasional visits to her and her children, after the misunderstanding with Mr. Carrington, but avoided making these visits when Mr. Carrington was at home. Arnold also took Mrs. Carrington and her children with him on a trip to Eureka. Contestant relies upon these visits of Arnold to the Carrington home and this trip to Eureka as evidence tending to support his contention that Arnold's will was the result of the exercise of undue influence over him by Mrs. Carrington. It is needless to say that this contention cannot be sustained. There is absolutely not one iota of evidence that

Mrs. Carrington ever discussed with Arnold the subject of his will, or ever suggested to him that he should include her therein as one of its beneficiaries. There is no evidence that Mrs. Carrington knew of the execution of the will before the death of Arnold and it is equally true that she did not in any way participate in its execution.

As to the contention of contestant that proponent, Vera L. Logan, improperly influenced said testator to make said will in her favor, the facts are much more involved. Arnold first met Mrs. Logan at her home in Santa Rosa one Sunday in March, 1936. He had been invited by Mr. Logan to have dinner with the Logan family, consisting of Mr. and Mrs. Logan and their nine year old daughter. Some time later, Arnold spoke to Logan and asked if he could not take his meals at the Logan home. Logan replied that it was all right with him if he could make satisfactory arrangements with Mrs. Logan. As a result of this conversation and after seeing Mrs. Logan regarding the matter, Arnold took his meals at the Logan home, paying therefor $50 a month to Mrs. Logan. Later Arnold sold his home and arrangements were made with the Logans for Arnold to have a room with them. Arnold was a heavy drinker, and was frequently so badly intoxicated that it was necessary to put him to bed in his room at the Logan home. During these times Mrs. Logan cared for him until he recovered, or until it was necessary for him to be sent to a hospital, which was frequently the case as Arnold suffered a number of attacks of delirium tremens after he began taking his meals with the Logans, both before and after he occupied a room in their home. Afterwards Arnold took a room at the Travelers Hotel and later at the Santa Rosa Hotel. At the direction of the doctor, Mrs. Logan took a room adjoining the room at the hotel occupied by Arnold for the purpose of caring for him during the periods when he was suffering from an over-indulgence in intoxicating liquors. It might be well to here state that Mr. and Mrs. Logan had separated some time after Arnold became a roomer at their home and it appears that they never were legally married.

Mrs. Logan some time before Arnold's death became acquainted with a salesman named Wedell, and shortly after Arnold's death she and Wedell were married. During the later months of Arnold's life he became very lavish in the expenditure of money, especially in behalf of Mrs. Logan.

He bought her an automobile and financed the purchase of a saloon for her and Wedell. He signed a power of attorney and delivered it to the Bank of America at Santa Rosa authorizing her to sign and endorse checks, notes and drafts, and conduct other business for him at the bank. Under this authorization she withdrew from the bank various sums of money, a considerable amount of which she evidently appropriated to her own use without any accounting to him.

Contestant claims that the amount of money squandered by Arnold between his wife's death and his own amounted to $24,000, a considerable portion of which went to Mrs. Logan. This amount is arrived at by contestant by taking from the appraised value of Mrs. Arnold's estate the amount of the estate left by Arnold. This appraised value of Mrs. Arnold's estate is taken from the certificate of the inheritance tax appraiser in Mrs. Arnold's estate which showed the total appraised value of her estate was $53,661.55. Our attention, however, is called to the final account in Mrs. Arnold's estate which shows that there were large claims filed and allowed against her estate, and that the total value of the property distributed to Arnold from his wife's estate was $39,282.58. The appraised value of the Hobart L. Arnold estate was shown to be $33,412.49. It is difficult to see how contestant arrives at the sum of $24,000 as the amount "squandered" by deceased after the death of his wife. The amount of $6,000 would seem to more correctly represent the difference between the value of the wife's estate distributed to Arnold and the value of the estate left by him. Contestant concedes that $2,500 of this amount was invested in a mining venture of uncertain value.

There is a large amount of evidence of the same character of that recited above respecting the association of Arnold and Mrs. Logan. They were together on numerous occasions. He continued his excessive drinking after suffering attacks of delirium tremens through which she sometimes nursed him and at other times he was sent to the hospital. They were often seen together and sometimes she was seen drinking with him and on at least one of these occasions she was intoxicated. There is no evidence they ever discussed the subject of his will, nor did she ever ask, or even suggest that he make his will in her favor.

From the foregoing the contestant contends that a confidential relation existed between Mrs. Logan and Arnold

which caused her to assume the burden of proving that the will was not obtained by her through undue influence and that the testator had the benefit of independent advice.

■ Conceding, simply for the purpose of argument, that a confidential relation was proved to have existed between Mrs. Logan and Arnold, proof of that fact alone did not cast the burden of proof upon her that the will was not obtained by her through undue influence. (*Estate of Purcell*, 164 Cal. 300, 303 [128 Pac. 932].) In that case it was held that proof of a confidential relationship did not bring into play a presumption of undue influence in the absence of evidence that the beneficiary suggested the terms of the will. In the *Estate of Baird*, 176 Cal. 381, 384 [168 Pac. 561], we find the applicable rule stated in the following concise language: "As suggested in *The Estate of Higgins*, 156 Cal. [257] 261 [104 Pac. [6] 8], a 'presumption of undue influence' arises from proof of the exercise of a confidential relation between the testator and such beneficiary, '*coupled with activity on the part of the latter in the preparation of the will.*' The confidential relation alone is not sufficient. There must be activity on the part of the beneficiary in the matter of the preparation of the will."

In an unbroken line of decisions of this court, the above statement of law has been approved. (*Estate of Anderson*, 185 Cal. 700, 716 [198 Pac. 407]; *Estate of Ricks*, 160 Cal. 450, 461 [117 Pac. 532]; *Estate of Relph*, 192 Cal. 451, 465 [221 Pac. 361]; *Estate of Lances*, 216 Cal. 397 [14 Pac. (2d) 768]; *Estate of Lavinburg*, 161 Cal. 536, 540 [119 Pac. 915]; *Estate of Presho*, 196 Cal. 639, 651 [238 Pac. 944]. See, also, 28 R. C. L. 146.)

As the evidence of contestant failed to show any activity on the part of Mrs. Logan in the procurement of the will of decedent, it was inadequate to prove undue influence on her part in the execution of said will. The evidence being insufficient to show that the will of said decedent was the result of the undue influence of either of the proponents, the court properly granted the motion of respondents for a nonsuit.

■ We will now give our consideration to contestant's further contention that the trial court erred in granting the motion for judgment notwithstanding the verdict. The right of the trial court to render a judgment notwithstanding the verdict is the same as its right to grant a nonsuit. (*Card* v. *Boms*, 210 Cal. 200, 202 [291 Pac. 190].) It may neither

grant this motion for a nonsuit nor may it render judgment notwithstanding the verdict if there is any substantial evidence before the court in the first instance in support of plaintiff's case, or in the second instance in support of the verdict rendered by the jury. We have, in the preceding portion of this opinion, set forth the correct rule governing the trial court in passing upon a motion for a nonsuit, and as this rule applies with equal force to a motion for the entry of judgment notwithstanding the verdict, it is unnecessary to restate it here.

The motion for judgment notwithstanding the verdict was made and granted on the ground that contestant had produced no evidence tending to support the finding of the jury that Arnold was not of sound and disposing mind on May 6, 1936, the date of the will.

It is the contention of contestant that there was sufficient evidence before the court to submit the question of unsoundness of mind to the jury, and that it was error for the trial court to enter judgment admitting the will to probate notwithstanding the verdict of the jury finding the deceased to be of unsound mind at the date on which the will was executed.

The evidence in support of the claim of contestant that the testator was of unsound mind at the time the will was executed was given by three physicians and a number of intimate acquaintances of the testator.

Practically all the testimony of these witnesses, both medical and lay, was directed to the intemperate habits of the deceased. Dr. Pleth was the family physician of Mr. and Mrs. Arnold from 1929 to the death of Mrs. Arnold in July, 1935. He ceased to be the Arnolds' physician a short time prior to Mrs. Arnold's death, although he frequently saw him on the streets of Santa Rosa, and a time or two in the doctor's office. Dr. Thurlow testified that he treated Arnold between September, 1935, and the spring of 1936. Dr. Roy, the third medical witness testifying in behalf of the contestant, never treated the deceased, but testified in answer to a hypothetical question propounded to him that in his opinion Arnold was of unsound mind on May 6, 1936, the date of the purported will of Arnold.

Dr. Pleth's testimony covered a period of time extending over six years, during which he treated Arnold for being drunk around two hundred times, giving him bromides mostly because they quiet the nervous system without laying the

patient up. Sometimes he gave Arnold atropin sulphate and also injections of salt water and twenty per cent sugar for the purpose of dehydrating the brain. There were given two or three dozen times at least to reduce certain swelling brought on by alcoholic debauches. He treated him for numerous attacks of delirium tremens which would last sometimes two or three hours, sometimes half a day and sometimes an entire day. He treated Arnold for psychosis which he called alcoholic degeneration or chronic alcoholism. He stated that Arnold at those times was always alcoholic. He was always alcoholic, he was unaccountable. He further testified that Arnold was always drunk and when a man is that way he is called incompetent and unable to observe, to base an opinion, or to handle his estate and possessions. He was a thoroughgoing alcoholic. At one time he had an attack of delirium tremens at his house. He said he was tired of living, and Dr. Pleth found a bottle of strychnine secreted in Arnold's bed. His condition was progressive chronic alcoholism which was destructive of the brain cells, and in Mr. Arnold's case it interfered with his power of thinking and that portion of the brain cells where he did his thinking must have been injured, damaged or destroyed. It is the rule that one suffering from chronic alcoholism has an impaired memory. He had a positive Romberg condition, in which he could not balance. The pupils of his eyes were unequal. He had trouble with the liver, cirrhosis of the liver, which brought on dropsy. He had arthritis, lumbago and arterial sclerosis. He had a poor memory; he could not remember from one day to another the orders given and the doctor had to give his orders to other people, the usual orders for sick people as to what they shall eat and drink and the time to go to bed. A poor memory or inability to recollect is of no particular significance in connection with the pathology of the brain. Brain cells that are damaged or destroyed as a result of chronic alcoholism may recover to some extent in very early stages of drunkenness, if drinking is stopped in time, but they never completely recover, and in many later stages these cells can never be repaired or replaced. Dr. Pleth treated Arnold in his office after the death of the latter's wife. He was then drunk. He was always drunk. In Dr. Pleth's opinion Arnold was of unsound mind on the 6th day of May, 1936, the day his purported will bears date.

Dr. Pleth states that he never attended Arnold at the hospital or at his home after his wife died. He was always drunk and nervous. There was a tremor in his hands. In 1929 he tried to write his name, but it was a shaky hand which increased progressively down until the time of his death. He had a tremor in his hands. It was a wavering handwriting, and in Dr. Pleth's language, "In English I would call it scribbling."

Dr. Thurlow testified that he was called several times to give medical aid to Hobart L. Arnold between September, 1935, and spring of 1936, both at his house on Sonoma Avenue and at the home of Mrs. Logan on Wright street, each time for something pertaining to alcoholism and on one or two occasions it was delirium tremens. He hospitalized Arnold for alcoholism or delirium tremens. Delirium tremens deteriorates all the brain structures through a period of years. He last visited Arnold in the spring of 1936, but had no record of "putting down" anything about the case on that occasion, and does not recall whether he was drunk or sober. There can never be a complete restoration of the thinking power of the brain where the injury is due to the excessive use of intoxicating liquor, where it is repeated over a number of years. Dr. Thurlow met Arnold on the street once. He was drunk. During his observation of Arnold and from the history of his case, Dr. Thurlow stated that Arnold was of unsound mind in the medical sense, having reference to the deterioration of the brain cells.

The intimate acquaintances who were called on behalf of contestant testified generally to Arnold's excessive drinking. As a rule they stated that on numerous occasions when they saw him he was drunk. Mrs. Baudau testified that when Arnold was drunk he was irrational. Josephine Gibson, who testified about Arnold from her observation of him, said that he was irrational. Others testified that most of the time Arnold was drunk and that he did not know what he was doing; that he was irrational and was not capable of taking care of his business; and three others testified that he was irrational.

Possibly the strongest testimony in favor of contestant was that given by Dr. Pleth. He testified that Arnold was always drunk. Of course, he could only testify to those occasions when he observed Arnold. He could not testify that Arnold was drunk at times when he did not see him. Thirteen of contestant's witnesses testified to various occasions, during

the years 1935, 1936, and 1937, when they met and observed Arnold that he was sober. It is not necessary to set forth their testimony, but we will refer to two of them. Pete Falkins borrowed money of Arnold on two occasions during December, 1936, and January, 1937. On each occasion Falkins met Arnold by previous appointment. W. D. Wright saw Arnold at his home in regard to a money deal in December, 1936, or January, 1937. Arnold promised to meet him at Berger's on the following day and he kept his appointment. Arnold appeared perfectly rational and their conversation was confined to business. There was no indication that Arnold had been drinking on that occasion. The testimony of these witnesses, considered in connection with that of Dr. Pleth, establishes two facts. The first of these is that Arnold was not always drunk, but that there were intervals when he was sober and able to transact business, and the second of these two facts is that Dr. Pleth's testimony relates only to occasions when Arnold was drunk. When, therefore, Dr. Pleth testified that Arnold had no memory and could not remember the orders he gave him from one day to another, and the doctor had to give the orders to other people, he was referring to occasions when Arnold was drunk or so far under the influence of liquor as to be unaccountable. He could not be referring to occasions when Arnold was sober, and transacted business, meeting appointments made on previous dates. This same conclusion must be reached when considering other testimony given by Dr. Pleth. He referred to Arnold drunk and not Arnold sober. This evidence falls far short of that required to prove that Arnold was mentally incompetent to make a valid will. In fact it is no evidence of the unsoundness of mind of a sober individual. (*Estate of Carithers*, 156 Cal. 422 [105 Pac. 127].) The same may be said respecting the testimony of Dr. Thurlow. He saw Arnold only when the latter was drunk.

Both Dr. Pleth and Dr. Thurlow, as well as Dr. Roy, testified Arnold was of unsound mind, and a number of his intimate acquaintances gave as their opinion that he was irrational due to his reported indulgence in intoxicating liquor.

It is well settled that mere proof of mental derangement or even of insanity in a medical sense is not sufficient to invalidate a will, but the contestant is required to go further and prove either such a complete mental degeneration as

denotes utter incapacity to know and understand those things which the law prescribes as essential to the making of a will, or the existence of a specific insane delusion which affected the making of the will in question. (*Estate of Shay*, 196 Cal. 355, 359 [237 Pac. 1079] ; *Estate of Russell*, 189 Cal. 759, 769 [210 Pac. 249].)

"In considering the evidence it is important, preliminarily to observe that it is not every form of insanity, not every mental departure from the normal, which destroys an otherwise valid testamentary act. The rule of law is not that no person who is insane may make a valid will, but that the will of no person who, by reason of insanity, is incapable of making valid testamentary disposition shall be upheld." (*Estate of Chevallier*, 159 Cal. 161, 168 [113 Pac. 130].)

"Ability to transact important business, or even ordinary business, is not the legal standard of testamentary capacity; though it seems to be quite generally but mistakenly supposed, outside of the ranks of the legal profession, that a capacity to transact important business is the criterion of fitness to make a valid will. Says the Iowa Supreme Court (*Perkins* v. *Perkins*, 116 Iowa 253 [90 N. W. 55]) : 'While, as every lawyer knows, a man may be capable of making a good will after he is so far gone in imbecility and mental darkness as to be no longer capable of making a valid deed or of transacting business generally, the very opposite conclusion seems to pervade the lay mind, and the making of a will is, to its apprehension, the one item of business which requires the presence of all one's faculties in their normal strength.' " (*Estate of Sexton*, 199 Cal. 759, 768 [251 Pac. 778].)

Further this was said in the same case, at page 764: "A testator is of sound and disposing mind and memory if, at the time of making his will, he has sufficient mental capacity to understand the nature of the act he is doing, to understand and recollect the nature and situation of his property and to remember, and understand his relations to, the persons who have claims upon his bounty and whose interests are affected by the provisions of the instrument."

Still further in the same case, the court said, at page 766: "Testamentary capacity is always presumed to exist until the contrary is established. That is to say, the presumption is always that a person is sane, and the burden is always upon the contestant to show affirmatively and by a preponderance

of evidence that the testator, at the time of executing the will, was of unsound mind. (*In re Wilson,* 117 Cal. 262 [49 Pac. 172, 711]; *Estate of Perkins, supra,* [195 Cal. 699 (235 Pac. 45)]; 26 Cal. Jur. 756.)''

Dr. Thurlow's evidence was that in his opinion Arnold was of unsound mind in the medical sense. No greater weight can be given to the testimony of the two other physicians who gave as their opinion that the testator was of unsound mind. Their testimony must be construed in connection with the other evidence in the case produced on behalf of the contestant which showed that Arnold did attend to his ordinary business, made loans, met his appointments made previously and also acted as the executor of his wife's will in the settlement of her estate in the probate court of Sonoma county during the years 1935, and 1936.

''A person who has mental power to understand and to transact the ordinary business affairs of life doubtless has capacity to make a valid will. But the converse is not necessarily true. Mental perception and power to think and reason of a lesser degree than that which is required in the understanding and transaction of ordinary business may be all that is requisite to the full understanding of everything involved in the execution of a will.'' (*Estate of Sexton, supra,* 199 Cal. 759, 769.)

 Great reliance is placed by contestant upon the evidence of Doctors Pleth and Thurlow that long and excessive use of intoxicating liquor causes a disease and deterioration of the brain cells, which results in a loss of memory and impairment of the mental faculties. Contestant contends that long and excessive use of intoxicating liquors had brought this condition upon Arnold. Giving this evidence all that can possibly be claimed for it, it simply shows that Arnold had sustained, as a result of chronic alcoholism, a loss of memory and an impairment of his other mental faculties, but it failed to show that ''utter incapacity to know and understand those things which the law prescribed as essential to the making of a will.''

''Where the point is made that a decedent was of unsound mind at the time he executed his will because of long use of alcoholic liquors, evidence of such use both before and after the execution of the will and of the effect thereof upon his mind is admissible in so far as it tends to reveal his mental

condition at the time of the execution of the will. The intemperate use of alcoholic beverages, if continued for a sufficient length of time, may destroy testamentary capacity. Nevertheless, in the absence of proof that the intemperate use has actually destroyed testamentary capacity, no presumption will be indulged, however long continued the habit is shown to have been, that it has thus been destroyed." (*Estate of Fisher*, 202 Cal. 205, 209 [259 Pac. 755].)

As we have seen the will of Arnold was prepared by him and was entirely in his own handwriting. It is a perfectly natural will. Of the two principal beneficiaries, one was an old friend of his wife, during her lifetime, and the other was his personal friend who had been kind to him and cared for him during his numerous spells of sickness brought on by excessive drinking. Of those who received lesser amounts under this will, one was a lady who had lived next door to him and his wife, during the lifetime of his wife, and the others, with the exception of the contestant, were relatives of his wife or old friends of himself and his wife for years past.

The contestant, as we have seen, was given $1,000. He lived at Modesto, and while he was on friendly terms with the testator they had seen little of each other for a number of years prior to the testator's death.

"Nephews are not necessarily the natural objects of the bounty of a testator." (*Estate of Jacobs,* 24 Cal. App. (2d) 649, 651 [76 Pac. (2d) 128].) "Moreover, it is well settled that collateral heirs such as brothers and sisters are not 'natural objects of bounty' as that term is used in the interpretation of wills, and therefore in cases such as this, where the next of kin are collaterals, and one or more are not provided for in the will, the pretermitted persons, in order to establish that the instrument is unnatural, must show affirmatively that they had peculiar or superior claims to the decedent's bounty; and if no such claim is adduced, the instrument cannot be held to be unnatural. (26 Cal. Jur. 695, 696.)" (*Estate of Jacobs*, 24 Cal. App. (2d) 649, 652 [76 Pac. (2d) 128].) There is a dearth of any showing by contestant in this action that he had any peculiar or superior claim to the bounty of the testator.

Absolutely no showing was made that the testator at the time of executing his will was not in the possession of sufficient mental capacity to understand the nature of his act,

the extent and character of his property, and the relationship to persons who were the natural objects of his bounty. If a person has sufficient mental capacity to know and understand these three requirements, he is possessed of sufficient mental capacity to make a will disposing of his estate. (*Estate of Perkins,* 195 Cal. 699, 703 [235 Pac. 45]; *Estate of Shay, supra,* 196 Cal. 355, 361; *Estate of Sexton,* 199 Cal. 759, 764 [251 Pac. 778].)

So far we have said but little respecting the physical characteristics of Arnold's will, except that it is holographic in form, being entirely written, dated and signed by the testator. A photostatic copy of the will is before us, having been admitted in evidence, as an exhibit in support of contestant's case. Had one the least doubt of the mental capacity of Arnold at the date of its execution to make his will, it would be entirely dispelled by an inspection of the photostatic copy. It is mute, but convincing evidence that it was not prepared by a drunken person, or by one whose hand had become palsied by the long and excessive indulgence in intoxicating liquor. It consists of two pages, and is written in plain legible style. No nervousness or trembling on the part of the testator is indicated in the body of the will. We observe but one misspelled word in the whole document. The names of the beneficiaries are set forth, and the addresses of most of them are given, and in two instances even the street on which they resided is given.

We are in accord with the opinion of the trial court respecting the will, stated in the following language: "The will is a perfectly natural will and bears no evidence upon its face of any mental weakness of the testator, much less anything amounting to mental incapacity in a legal sense. On the contrary it is convincing evidence of his testamentary capacity, for it contains within itself direct evidence of every element of competent ability in this regard."

Respecting a will in a similar form and executed under circumstances similar to those surrounding the execution of the will not before us, the District Court of Appeal made the following observations, which in our opinion may well be applied to Arnold's will: "There is, as we have in other words declared, nothing in the testimony from which the inference necessarily follows that the deceased 'had no intelligent comprehension of what he was doing' when he wrote this his will.

To the contrary, the will itself is mute but convincing evidence of the fact that he fully comprehended what he was doing when he wrote it. Indeed, the fact that the will is holographic and that it was prepared by himself in strict accord with the law prescribing the requisites of such a testament— that by it he indicated that he knew that, as the law requires, such a will, to be valid, must be in the testator's own handwriting and dated by him—is itself well-nigh indubitable evidence that he was very much 'at himself' when he drew the instrument and that he knew precisely what he was doing and how he desired to dispose of his estate." (*Estate of Little,* 46 Cal. App. 776, 789 [189 Pac. 818].)

We therefore conclude that there was no substantial evidence presented by contestant in support of the finding of the jury that Arnold was not of sound and disposing mind on May 6, 1936, the date of the execution by him of the document offered in probate by the proponents. It was, therefore, the duty of the trial court to grant the motion for judgment in favor of proponents notwithstanding the verdict of the jury in favor of contestant.

The judgment is affirmed.

Shenk, J., Edmonds, J., York, J., *pro tem.,* Moore, J., *pro tem.,* and Gibson, C. J., concurred.

CARTER, J., Dissenting.—I dissent.

I am of the opinion that the trial court was not justified in granting a motion for judgment notwithstanding the verdict in this case because there was ample evidence from which the jury could reach the conclusion that the testator was mentally incompetent at the time of the execution of his will.

Bearing in mind that in cases of this kind all evidence in favor of the contestant must be taken as true, and if contradictory evidence has been received, it must be disregarded, we cannot ignore the testimony of the family physician who attended the testator from 1929 until during the year of 1935, that certain cells of Mr. Arnold's brain had been destroyed by alcoholism, and that in his opinion, Mr. Arnold was of unsound mind on May 6, 1936. Mr. Arnold's case was also characterized by said physician as progressive or growing deterioration of the mind and degeneration or destruction of the brain cells due to chronic alcoholism.

When a testator is afflicted with a progressive mental disease, cases in this state have held that "evidence of the testator's mental status, together with his appearance, conduct, acts, habits and conversation, both before and after the execution of the will, are admissible so long as they have a reasonable tendency to indicate his mental condition at the time of the execution of the will." (68 C. J. 463, sec. 71; *Estate of Hartley,* 137 Cal. App. 630, 633 [31 Pac. (2d) 240] ; *Estate of Alexander,* 111 Cal. App. 1, 7 [295 Pac. 53] ; *Estate of Ivey,* 94 Cal. App. 576, 587 [271 Pac. 559] ; *Estate of Sexton,* 199 Cal. 759 [251 Pac. 778] ; *Estate of Lenci,* 106 Cal. App. 171, 177 [288 Pac. 841] ; *Estate of Jones,* 166 Cal. 108, 111 [135 Pac. 288] ; *Estate of Albertson,* 31 Cal. App. (2d) 211, 217 [87 Pac. (2d) 883] ; *Estate of Miller,* 16 Cal. App. (2d) 154, 165 [60 Pac. (2d) 498].)

A summary of the evidence regarding the effect of chronic alcoholism upon the mentality of Mr. Arnold and of the progressive nature of his mental deterioration, gleaned largely from the testimony of his family physician and one other attending physician is, briefly, as follows:

The testator was addicted to the constant use of alcoholics. He was "incompetent as a thorough chronic alcoholic". Arnold was "always intoxicated" and "unaccountable"; he suffered numerous attacks of delirium tremens. He had to be treated for psychosis—alcoholic degeneration; at times he saw squirrels sitting on his bed posts, snakes squirming on the floor and other animals he could not describe. Between 1929 and 1935, he became steadily worse. During the latter part of 1933, he lost all interest in his wife, home, garden and in the things most normal people are interested in. He neglected his clothes, did not wash his face and did not button his coat. He said he was tired of living, and had to be deprived of a bottle of strychnine tablets which he kept secreted in his bed. On occasions he drank four or five quarts of whiskey or brandy in three days in his home. Those suffering from chronic alcoholism suffer a degeneration of the brain due to a frequent swelling of the membranes around the brain. Arnold's was a progressive chronic alcoholism destructive of the brain cells. The nerves extending out from the brain controlling the arms and legs were evidently damaged, because Arnold could not walk, but would stagger. He had a positive Romberg condition in that he could not balance. He

had cirrhosis of the liver, arthritis, lumbago and arterial sclerosis. Repeated occurrences of delirium tremens and of a condition of intoxication over a period of years deteriorate all brain structures. In Mr. Arnold's case, according to the rules of the law of medicine, that portion of the brain where thinking is done was damaged or destroyed. Due to his alcoholic debauches, the family physician was of the opinion that the cells of Arnold's brain had shrunk and impaired his power of thought. The tortuous, twisted blood vessels revealed by an examination of his eyes, indicated a brain disturbance or degeneration from alcoholism. He suffered from an emotional disturbance, feared that enemies were talking about him. He was nervous and shaky and there was a tremor in his hands. He had no memory at all. Numerous intimate acquaintances testified that the testator was almost continuously intoxicated and irrational.

In spite of the positive and impressive character of the evidence with regard to the testator's mental incompetency, the majority opinion states that such evidence failed to show that Arnold's excessive use of intoxicating liquor over a long period of time had destroyed "utter capacity to know and understand those things which the law prescribed as essential to the making of a will.·

As authority for this view said opinion relies upon the case of *Estate of Fisher*, 202 Cal. 205, 209 [259 Pac. 755], and particularly upon the following excerpt therefrom:

"Where the point is made that a decedent was of unsound mind at the time he executed his will because of long use of alcoholic liquors, evidence of such use both before and after the execution of the will and of the effect thereof upon his mind is admissible in so far as it tends to reveal his mental condition at the time of the execution of the will. The intemperate use of alcoholic beverages, if continued for a sufficient length of time, may destroy testamentary capacity. Nevertheless, in the absence of proof that the intemperate use has actually destroyed testamentary capacity, no presumption will be indulged, however long continued the habit is shown to have been, that it has thus been destroyed."

It seems to me that the proper view to be taken of the instant case is not that the evidence presented herein to show decedent's lack of testamentary capacity raised a presumption that said capacity had been destroyed, but that there was

evidence that the continued and excessive use of liquor had caused a disease and destruction of decedent's brain tissue, with a resultant loss of memory and other faculties, and that, therefore, testimony as to the mental condition, acts, and conversations of the testator, both before and after the execution of his will was properly submitted to the jury to determine his competency on the date of its execution, and, further, that the determination of this issue was within the province of the jury.

Objections to the positive testimony that the testator was of unsound mind when the will was executed, such as those that the family physician had not seen the testator at all times or had not attended him continuously up to the time of his death, go to the weight of the testimony and are likewise matters to be determined by the trial jury and not by this court. The same rule applies to the argument that the will itself established the fact that there was testamentary capacity. It may be some evidence of the fact, but certainly is not conclusive to the extent that all other evidence to the contrary must be disregarded.

In my opinion therefore, the judgment of the trial court should be reversed.